UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE ESTATE OF CARLOS BORROTO AND MARITZA CLARK AND ERIC FRIAS as Administrators ad prosequendum for the estate of Carlos Borroto,<br><br>Plaintiffs,<br><br>v.<br><br>CFG HEALTH SYSTEMS, LLC, et al.,<br><br>Defendants. | Civil Action No. 19-17148 (MCA) (JBC)<br><br><br>OPINION |

This matter comes before the Court on four motions for summary judgment seeking dismissal of Plaintiffs' Complaint, which brings civil rights, negligence, and wrongful death/survivorship claims against various Defendants arising from the suicide of Charles Borroto ("Mr. Borroto") at Hudson County Correctional Center ("HCCC"). The motions for summary judgment are brought by (1) CFG Health Systems LLC ("CFG") and Samonte Sofrado, NP ("Medical Defendants"), (2) Hudson County, Ronald P. Edwards, and Dorthea Kalinisan, RN ("County Defendants"), (3) Hackensack Meridian Health Palisades Medical Center ("PMC") and (4) Dr. Frank Santos, M.D.[1] Defendants' challenges to Plaintiff's expert reports and testimony and the admission of other evidence are denied without prejudice to the filing of motions pursuant to *Daubert v. Merrill Dow Pharmaceutical, Inc.*, 509 U.S. 579, 589 (1993) or other motions in limine, if appropriate. PMC's motion to limit damages pursuant to N.J.S.A. 2A:53A-

---

[1] With respect to joint arguments by PMC and Dr. Santos, the Court refers to them as the "Hospital Defendants."

7 & 8 to $250,000.00 is granted as unopposed. The motions for summary judgment are otherwise denied for the reasons stated in this Opinion.

## I.    FACTS AND PROCEDURAL HISTORY

This action arises from the death by suicide of Mr. Borroto while incarcerated as a pretrial detainee at Hudson County Correctional Center ("HCCC") on March 25, 2018, and is brought by Plaintiffs Maritza Clark and Eric Frias ("Plaintiffs"), who are joint Administrators Ad Prosequendum for the Estate of Mr. Borroto. *See* Complaint ¶ 15.

### a. During the Relevant Time Frame, CFG was under Contract with Hudson County to Provide Medical and Mental Healthcare at HCCC

Prior to and at the time of Mr. Borroto's incarceration and death on March 25, 2018, CFG was under contract with Hudson County to provide Medical Health Care Management, Mental Health Management, and Fiscal Management at HCCC and was awarded a competitive contract as the vendor providing these services totaling $29,412,509.33 from December 1, 2016 through November 30, 2021. CSMF (CFG) ¶ 1 (citing Ex. D, CFG Contract).

The County Defendants contend that CFG "was solely and completely responsible for the provision and oversight of medical and mental health care services at HCCC, including psychiatric and psychological care." HCCC SUMF ¶ 5 (citing Rahaman Dep. 57:11-59:5). Plaintiffs contend that the County's "responsibility" is a legal matter in dispute. RSUMF (HCCC) ¶ 5. Plaintiffs further contend that Hudson County and CFG worked together to create and modify suicide prevention programs and corrective action plans. CSMF (County) ¶ 6 (citing Ex. M. Rahaman Dep. 68:22-70:6; Ex. J, Edwards Dep. 99:2-104:13; Ex. G at Hudson 00013-00015).) In addition, the contract between HCCC and CFG states that "all Contractor proposed policies are subject to final approval of the Director or designee." *See* Pl. Ex. E at Contract Documents 78-79. Defendant Ronald Edwards, the Director of HCCC at the time of Mr.

Borroto's death, testified that he signed off on policies and procedures for CFG.[2]  (*See* Ex. J, Edwards Dep. 106:19-107:10.)  Denise Rahaman, the Director of Corrections for CFG at the time of Mr. Borroto's death, *see* Rahaman Dep. 62:2-6, also testified that the jail administrator signs off on CFG's policies.  *See id.* at 49:25-50:6.

### b. The Spike in Suicides at HCCC during 2017-2018 while CFG was the Contracted Medical Provider

Between June 2017 and March 25, 2018, there were six inmate deaths at the HCCC, including the death of Mr. Borroto.  CSMF (CFG) ¶ 4 (citing Ex. K, Oscar Aviles dep. 85:4-19; Ex. L (News Article)).  The Hudson County Board of Chosen Freeholders were aware of the five inmate deaths that occurred prior to Mr. Borroto's death.  CSMF (CFG) ¶ 5 (citing Ex. K, Aviles Dep. 94:22-95:9; Ex. L).  Three inmates at HCCC committed suicide in the eight months prior to Mr. Borroto's suicide.  Jennifer Towle died by suicide on July 14, 2017.  CSMF (CFG) ¶ 6 (citing Ex. K, Aviles Dep. 41:3-16; Ex. L).  Cynthia Acosta died by suicide by hanging on January 14, 2018.  CSMF (CFG) ¶ 7 (citing Ex. M, Rahman Dep. 59:17-21).  James Kaufman died by suicide by hanging on January 26, 2018.  CSMF (CFG) ¶ 8 (citing Rahaman Dep. 120:11-16.).

Rahaman testified that she was aware of these deaths at HCCC and knew about each suicide that happened at HCCC.  CSMF (CFG) ¶¶ 10-11 (citing *id.* at 59:19-61:17).  Rahaman considered the number of suicides at HCCC between 2017 and 2018 to be a lot in comparison to other jails CFG managed and in comparison to prior years at HCCC.  Rahaman also testified that she was aware that civil rights groups were making accusations regarding the medical care of inmates and ICE detainees at HCCC; due to the elevated numbers of deaths, CFG and HCCC

---

[2] HCCC also employed a Medical Director, Dr. Frank Molinari, to oversee CFG and ensure that CFG was providing the proper healthcare to inmates.  CSMF (County) ¶ 10 (Edwards Dep. 31:13-32:8; 78:22-79:15.)

conducted investigations and chart reviews and reviews of operations at HCCC to determine why there were excessive deaths happening in Hudson County.  CSMF (CFG) ¶ 12 (citing *id.* at 59:22-62:1; 68:15-69:5).  CFG and HCCC administration had discussions, including suggestions and corrective action plans, in response to the elevated number of deaths.  According to Rahaman, "[s]ome of the suggestions were implemented, some were not."  CSMF (CFG) ¶ 13 (citing *id.* at 69:1-5.)

The Hudson County Board of Chosen Freeholders, Hudson County, and HCCC administrators were also aware of the five inmate deaths that preceded Mr. Borroto's death. CSMF (County) ¶ 12 (citing Ex. K., Aviles Dep. 94:22-95:9. Ex. L.)  Prior to Mr. Borroto's death, Hudson County assembled a medical review panel to investigate suicides in the jail and provide recommendations, but Plaintiffs contend that these recommendations were not implemented before Mr. Borroto's death.  *See* CSMF (County) ¶ 19 (citing Ex. W at 00438, Aviles Dep. 74:5-75:11).

### c. Hudson County Hires a Medical Monitor for HCCC in Response to the Spike in Inmate Deaths at HCCC

On August 10, 2017, the Board of Chosen Freeholders County of Hudson passed Resolution No. 519-8-207 awarding a professional services contract to NCCHC Resources, Inc. ("NRI") for $90,000.00 to perform medical monitoring services.  CSMF (CFG) ¶¶ 14-15 (citing Ex. H).  Hudson County contracted with NRI due to the deaths that occurred in 2017 and numerous advocates who complained about the treatment of detainees at HCCC.  CSMF (CFG) ¶ 16 (citing Ex. J, Edwards Dep. 77:15-78-1; Ex. K, Aviles Dep. 42:15-43:6).  NRI produced Health Care Quality Assessment Reports, and the first report was dated October 2017, five months prior to Mr. Borroto's death and two months prior to the suicide deaths of Cynthia Acosta and James Kaufman.  CSMF (County) ¶ 17 (citing Ex. U, NRI Oct. 2017 report).

NRI also conducted a three-day quality assessment of health services at the Hudson County Correctional Center in September 2017 to identify health care issues that need correction or improvement, with particular attention to concerns related to two recent mortality cases. It was noted that Mental Health services were available on-site weekdays, with on-call coverage during evenings and weekends. Potential areas of concern identified by Hudson County included mortality review, suicide prevention, and staffing. CSMF (County) ¶ 18 (citing Ex. U, NRI Oct. 2017 report). Areas of concern identified by NRI upon this initial assessment included the following: Intake nursing personnel must receive ongoing training for medical, dental, and mental health screening; Intake screening policies and procedures need to be strengthened to improve patient care; Verification of medications being taken by newly arrived inmates must occur; Policies and procedures concerning restrictive housing, particularly with regard to suicidal inmates, need to be strengthened; Improve policy and procedures concerning suicidal inmates. CSMF (County) ¶ 19 (citing Ex. U, NRI Oct. 2017 report).

After the three-day quality assessment of health services at the HCCC, the lead NRI consultant met with the HCCC Director and with CFG administrative staff, "to review findings from the September visit as well as CFG's corrective action plan to address NRI's recommendations." Based on this initial assessment, continued monitoring was recommended, including a second site assessment in January 2018. (Ex. U, NRI March 2018 report).

NRI conducted another site visit from January 29-31, 2018 and produced another Health Care Quality Assessment Report dated March 2018. This report indicated the following major areas of concern: Death reviews; Isolation and suicide prevention training; Patient assessment; and Suicide monitoring. CSMF (County) ¶ 21 (citing Ex. U, NRI March 2018 report). The March 2018 report further states:

> On January 29-31, 2018 the NRI team conducted a three-day follow-up assessment. The purpose was to review the health care issues previously identified and to assess the action plans initiated as a result of NRI's recommendations. Particular attention was given to concerns related to recent mortality cases. Since the September 2017 assessment, three additional mortality cases had occurred.

CSMF (County) ¶ 22 (citing Ex. U, NRI March 2018 report). In the conclusions and ongoing monitoring section, the NRI March 2018 report notes that "it is essential that collaboration between custody, training, and the entire health team be improved." CSMF (County) ¶ 23 (citing Ex. U, NRI March 2018 report). The report also noted key positions in the health services department that had been vacant, including a director of nursing and a health services administrator, and that these vacancies impeded collaboration between nursing staff and corrections staff and hindered the implementation of corrective action measures. *Id.*

Edwards received the NRI reports and reviewed the recommendations, but he only implemented some of the recommendations "on occasions, but not all of them." CSMF (County) ¶ 32 (citing Edwards Dep. 83:21-84:4.)

### d. Mr. Borroto is Arrested by West New York Police, Transported to Palisades Medical Center, and Evaluated by Dr. Santos

In the days leading up to his arrest, Mr. Borroto repeatedly called the West New York Police Department and threatened to jump off a building. *See* ECF No. 81-1, CFG Ex. P at 8. It is undisputed that on the morning of March 23, 2018, the West New York Police Department arrested Mr. Borroto for outstanding warrants and for resisting arrest and transported him to PMC, where he was admitted for evaluation at 9:42 a.m. Triage notes from the Emergency Room records state: "brought in by West New York police for psych/medical clearance for incarceration, noted anxious / was verbalizing suicidal thoughts with plan to jump out of the building while in jail, c/o pain left side of head and behind left ear." CSMF (CFG) ¶ 48 (citing ECF doc 88-11, Ex. J at 4). Continuing triage notes under "psych/social" states, "Yes, patient

currently wish to harm self or others." *Id.* Mr. Borroto was assessed to be a 'positive risk for suicide' with the notation, "verbalized suicidal thoughts with plan to jump off a building." *See* Ex. J at 6. During the nursing assessment, further notes under 'psych/social' state, "suicidal ideations present, as pt report want to kill himself." Ex. J at 10. During his medical assessment and review of systems ("ROS") it was noted, "historian reports depression, Historian denies homicidal ideation, Historian reports suicidal ideation." *See id.* at 12.

At PMC, Mr. Borroto was evaluated by Dr. Santos, a physician who specializes in Psychiatry. CSMF (Santos) ¶ 1 (citing Ex. C, Santos Answer, Ex. H. Santos CV). Dr. Santos noted that Mr. Borroto had a history of polysubstance abuse and had previously been diagnosed with mental health disorders for which he was being treated. Santos SUMF ¶ 27; RSUMF ¶ 27. Mr. Borroto also admitted to prior suicide attempts, but did not provide details; he also admitted to 10 prior psychiatric hospitalizations, with the most recent hospitalization in March. Ex. J, Santos Dep. 151:20-154:11.

Dr. Santos testified that during the psychiatric evaluation, Mr. Borroto denied any immediate suicidal ideation. Santos Dep. 150:16-20. Dr. Santos further testified that he asked Mr. Borroto about his statements to police that he was suicidal and planning to jump off a building, and Mr. Borroto told Dr. Santos that he had been calling the police for a week to deny the allegations made by his ex-girlfriend. Plaintiffs dispute the portion of Dr. Santo's testimony in which he suggests that Mr. Borroto made the suicide threats merely to get the attention of police: "It was [Mr. Borroto's] way to get the police's attention. He had no intention to actually kill himself, according to what he told me." *See* Santos SUMF ¶ 26 (citing Santo Dep. 149:17-150:20; RSUMF (Santos) ¶ 26 (citing Ex. J, Santo's Dep. 149:17-150:9).

Dr. Santos cleared Mr. Borroto psychiatrically for incarceration. Santo SUMF ¶ 28; RSUMF (Santo) ¶ 28. In his deposition, Dr. Santos stated that cleared for incarceration meant Mr. Borroto "was cleared to be incarcerated in forensic unit for the mentally ill. Not for the general population. I want to make that clear." Santos Dep. 175:15-22. Santos elaborated that he believed, based on his training and experience, that an individual who was psychiatrically cleared for incarceration with a diagnosis of bipolar disorder and taking psychotropic medications would not be placed in the general population at the jail. *See id.* at 185:14-189:19.

Dr. Santos did not provide any instructions limiting where Plaintiff should be housed at HCCC. When Dr. Santos was asked whether he provided discharge instructions, he responded: "Discharge instructions I provided was that he was psychiatrically cleared for incarceration and with a diagnosis." RSUMF (Santos) ¶ 28 (citing Santos Dep. 136:15-137:24). Dr. Santos signed a Psychiatric Acute Services Discharge Summary For Hudson County Correctional Facility Medical Department & Central Judicial Processing Court which included a 'presenting problem' of 'anxiety/somatic complaint,' diagnosis of polysubstance abuse and bi-polar disorder I and a clearance for incarceration. *See id.* (citing Santos Ex. H). The section of the form for listing of medications was also left blank by Dr. Santos. (*See id.*) Dr. Santos testified that it was his "understanding" that whatever medications were listed in the discharge medical records, which he did not create nor distribute, would be continued at the prison. He testified that he did not list his current medications on the form because he had made no changes to Mr. Borroto's medications. Santos Dep. 156:22-159:18).

Plaintiffs also dispute whether Dr. Santos indicated that Mr. Borroto needed to follow up with a physician in 1-2 days. Santos SUMF ¶ 29. Plaintiffs contend that Dr. Santos only cleared Mr. Borroto for incarceration and did not make any recommendations for follow up, medications

or instructions for future care of any kind.  RSUMF ¶ 29.  In his deposition, Dr. Santos expressly denied giving instructions to have Mr. Borroto follow up with a primary care physician.  *Id.* (citing Santos Dep. 136:8-137:24).

After Mr. Borroto was seen by Dr. Santos, he was evaluated and treated by Dr. Ruocco in the Emergency Department and underwent a CT head scan.  Santos SUMF ¶ 30; RSUMF (Santos) ¶ 30.  Although there are no notes suggesting that Mr. Borroto requested mental health care, Dr. Ruocco's "review of systems" notes for "psychiatric" states: "Historian reports depression.  Historian denies homicidal ideation; Historian reports suicidal ideation."  RSUMF ¶ 33 (Santos Ex. H).  Dr. Santo stated in his deposition that he did not know how Dr. Ruocco obtained that information but conceded that the word "historian" usually meant the patient.  *Id.* (citing Santos Dep. 132:1-134:17).

The medical records from PMC also identify the medications, Vistaril, Cogentin, Navane and Trazodone, and dosages which Carlos Borroto was taking with instructions to "continue as prescribed".  CSMF (Santos) ¶ 50 (citing Ex. J at pg. 13).  Under 'Medication Reconciliation', where his medications and instructions to continue as prescribed are located, it states, "notes from the emergency department: Discharged Instructions sent with pt., Reviewed with patient." *Id.*  Mr. Borroto was discharged to police custody, who were provided a "summary of care" and "electronic copy of Discharge Instructions."  (See ECF doc 88-11, Ex. J at pg. 14).

Upon discharge, Mr. Borroto was taken to the West New York Police Department for processing, where he remained for approximately eight hours, and he was then transported to HCCC, arriving just before midnight.  Santos SUMF ¶ 34 (citing Ex. K); RSUMF (Santos) ¶ 34.

### e.  Plaintiff's Intake and Mental Health Assessments at HCCC

Mr. Borroto was processed into HCCC at approximately 12 a.m. on March 24, 2018. CFG SUMF ¶ 42 (citing Ex. F); RSUMF ¶ 42.  The process at HCCC included an initial booking/intake by HCCC custody personnel, in which a "Custody In House Risk Supplemental Risk Assessment" indicated incorrectly that Mr. Borroto had never considered or attempted suicide in the past, did not take prescribed medication, and had no medical or mental health problems.  CSMF (County) ¶¶ 33-34 (citing Ex. S at 0052).  The medical intake records clearly indicate that Mr. Borroto advised that he had a history of mental health issues for which he was taking psychiatric medications, that he had attempted suicide in the past, and that he had an injury to his ear from the arresting officer.  CSMF ¶ 35 (citing Ex. S at 00089-000112).

Pursuant to CFG and HCCC intake policies, all entering inmates at HCCC must see a registered nurse, followed by a nurse practitioner who conducts intake examinations and makes referrals.  HCCC SUMF ¶ 7 (citing Ex. 5, Kalinisan Dep. 70:18-24); RSUMF (HCCC) ¶ 7.

Mr. Borroto saw HCCC employee Dorothea Kalinisan, RN, for an initial intake assessment.  CFG SUMF ¶ 43 (citing Ex. F (HCCF 2-14); RSUMF (CFG) ¶ 43; HCCC SUMF ¶ 6.  Kalinisan did not speak to the arresting or transporting officers.  As part of her intake, she answered "no" to the prompt "arresting or transporting officer believes inmate may be a suicide risk."  When asked why she answered "no" if she did not speak with the arresting officer, Kalinisan testified "because he [Mr. Borroto] said he is not suicidal."[3]  CSMF (County) ¶ 37 (citing Kalinisan  Dep.  78:4-20).  At the time of Mr. Borroto's death, there were no policies or procedures in place regarding communication between the arresting or transporting officer and

---

[3] Kalinisan testified that she checked this box because <u>Mr. Borroto</u> told her he was not suicidal. *Id.* at 78:11-79:7.

jail intake personnel pertaining to the exchange of medical and mental health information for inmates who are presenting for booking. Moreover, custodial staff did not inquire as to why Mr. Borroto was taken to the hospital for psychiatric clearance for incarceration, as there was no policy or procedure in place to obtain this information. CSMF ¶¶ 37-38 (citing Edwards Dep. 217:9-219:8.) It appears undisputed that the staff at HCCC did not know that Plaintiff had threatened to kill himself in the days prior to his admission at HCCC.

Plaintiffs emphasize, however, that Mr. Borroto had been previously incarcerated at HCCC, and his most recent period of incarceration was from May 26 through September 30, 2017. CSMF (CFG) ¶ 25 (citing Ex. T); CSMF (County) ¶ 40 (citing Ex. T). During these prior incarcerations, medical records were created and stored in HCCC's electronic medical record. CSMF (CFG) ¶ 26 (citing *id.*); CSMF (County) ¶ 41 (citing *id.*). These electronic medical records ("EMR") were available for review to all HCCC and CFG employees involved in the intake process on March 23 and March 24, 2018, and CFG medical and mental health personnel were supposed to review prior EMR during intake. CSMF (CFG) ¶ 27 (citing Rahman Dep 52:17-53:6; 87:2-13; Ex. O, Sofrado dep at 66:2-23; Ex. P, Maina dep at 65:4-15); CSMF (County) ¶ 42 (citing *id.*).

Mr. Borroto's EMR includes an Order executed by Judge DePasacle of the Hudson County Superior Court Criminal Division dated June 1, 2017, ordering the Medical Department of the HCCC to complete a mental status examination within two weeks from date of order. CSMF (CFG) ¶ 28 (citing Ex. T at HUD/BORROTO 00174); CSMF (County) ¶ 43 (citing *id.*) According to the EMR, the examination was completed on June 7, 2017 by Dr. Demetrios, and noted self-mutilation, auditory hallucinations, persecutory delusions, agitation, verbal threats and physical aggression. CSMF (CFG) ¶ 29 (citing Ex. T at HUD/BORROTO 00175-00176); CSMF

¶ 44 (citing *id.*)  The examination report further reported Mr. Borroto's multiple suicide attempts, intense suicidal ideation, poor impulse control and PCP use.  *Id.*  Dr. Demetrios opined that Mr. Borroto was at high risk for suicide.  *Id.*  After this examination, Dr. Demetrios prescribed Mr. Borroto Risperidone for continued auditory hallucination and paranoia.  CSMF (CFG) ¶ 30 (citing Ex. T at HUD/BORROTO 00173-00175); CSMF (County) ¶ 45 (citing *id.*).

It is undisputed that Kalinisan did not review Mr. Borroto's EMR from his prior incarcerations, and she testified that she did not think that she had access or was allowed to view prior incarceration records.  CSMF (CFG) ¶ 31 (citing Ex. N. Kalinisan  Dep. 55:13-22); CSMF (County) ¶ 46 (citing *id.*).  CFG Corrections Director Rahaman testified, however, that a CFG medical provider should check prior available medical intakes at the time of intake, and that this was a requirement in the March 2018 timeframe.  *See* Rahaman Dep. 52:12-53:1.  She further testified that it "should be" part of the training provided to CFG nursing staff.  *Id.* at 53:2-6.

During her assessment, Kalinisan noted that Mr. Borroto reported being diagnosed with bipolar disorder, schizophrenia, and ADHD, which Kalinisan learned from his hospital records.[4] CFG SUMF ¶ 44; RSUMF ¶ 44 (citing Kalinisan Dep. 77:2-11).  Mr. Borroto also reported being prescribed Cognetin and five other types of psychotropic medications, the names of which he could not recall, and that he was under the care of a psychiatrist, whose name he could not recall. *Id.*

Kalinisan completed a mental health questionnaire, indicating that Mr. Borroto had disclosed a previous suicide attempt (between 6 months and 5 years ago) and a history of

---

[4] Kalinisan testified that when a prisoner arrives from the hospital, she would review the hospital records at intake.  CFG SUMF ¶ 55 (citing Kalinisan Dep. 56:22-57:8); RSUMF ¶ 55.  The hospital records would be physically handed to her by a corrections officer who admitted the inmate, and she recalled seeing the hospital records for Mr. Borroto.  CFG SUMF ¶¶ 56-57 (citing Kalinisan Dep. 56:22-58:22); RSUMF ¶¶ 56-57.

psychiatric hospitalization but denied any current thoughts of killing himself and did not have current plans of committing suicide.  CFG SUMF ¶ 46 (citing *id.*); RSUMF ¶ 46.  In her deposition, Kalinisan testified that Mr. Borroto told her about his previous suicide attempt.  *See* Kalinisan  Dep. 79:15-24.  When asked whether Mr. Borroto told her how long ago he attempted suicide, Kalinisan testified: "I think [Mr. Borroto] said three years ago."  *See* CFG SUMF ¶ 51 (citing Kalinisan Dep.); RSUMF ¶ 51.  Kalinisan testified during the intake process she would ask about prior suicide attempts "for history purposes, for assessment purposes and the time frame is important . . . ."  The most current is usually . . . the most important, the most crucial."  CFG SUMF ¶ 52 (citing Kalinisan Dep. 82:24-83:1; 83:4-6); RSUMF ¶ 52.  Kalinisan also noted that Mr. Borroto had been incarcerated in the past; did not hold a place of respect in the community and did not express feelings of embarrassment or shame. CFG SUMF ¶ 47 (citing *id.*); RSUMF ¶ 47. On the mental health questionnaire, Kalinisan also indicated that Mr. Borroto was not acting in a bizarre or strange manner and did not appear disoriented; was not worried about any major problems, has not had a significant recent loss, showed no signs of depression and did not express hopelessness, or excessive anxiety.  CFG SUMF ¶ 48 (citing *id.*); RSUMF ¶ 48.  Kalinisan recorded that Mr. Borroto denied alcohol use but admitted to past PCP use.  CFG SUMF ¶ 49 (citing *id.*); RSUMF ¶ 49.

Due to Mr. Borroto's complaints of left ear pain, history of mental health issues, and his prescription medications, Kalinisan referred him to medical on a priority basis.  *Id.* at 68:19-69:4; *id.* at 118:19-22; Ex. F; *see also* County SUMF ¶ 8 (citing Kalinisan Dep. 70:4-7); RSUMF ¶ 7.

After his intake with Ms. Kalinisan, Mr. Borroto was transferred to medical at approximately 1 a.m. on March 24, 2018, and was screened by NP Samonte Sofrado, a CFG

employee.[5]  CFG SUMF ¶ 61 (citing Ex. F.); RSUMF ¶ 61.  According to the medical records, Mr. Borroto complained to NP Sofrado of headache and mental disturbance but denied suicidal ideation.  CFG SUMF ¶ 62 (citing *id.*); RSUMF ¶ 62.  Mr. Borroto disclosed that he had bipolar disorder, schizophrenia, and ADHD, and also disclosed daily PCR use.  CFG SUMF ¶¶ 63, 66 (citing *id.*); RSUMF ¶ 63; 66.  NP Sofrado noted Mr. Borroto was seen at PMC for medical and psychiatric clearance and that a recommendation was made for Mr. Borroto to continue his psychotropic medications, which Mr. Borroto was unable to specify and which still had to be verified.  CFG SUMF ¶ 64 (citing *id.*); RSUMF ¶ 64.  Sofrado further noted that that the information provided by Mr. Borroto changed several times, and that Mr. Borroto admitted he lies a lot.  CFG SUMF ¶ 64 (citing *id.*); RSUMF ¶ 65.  From the records, it appears that NP Sofrado prescribed Ibuprofen 600 mg twice daily for five days for Mr. Borroto's ear.  *See* Ex. F.

In his deposition, NP Sofrado testified that he did not always review prior electronic medical records when conducting intake assessments.  CSMF ¶ 32 (citing Ex. O, Sofrado Dep. 67:18-69:3.) When asked hypothetically whether he would ask for prior incarceration records for an inmate had been transferred from the hospital, psychiatrically cleared, and had a medical history of bipolar disorder, PCP use, and suicidal ideations, NP Sofrado answered "Yes."  *Id.* at 71:14-22; *see also* 72:11-19.  Sofrado was equivocal, however, about whether he thought Mr. Borroto's case was medically significant enough to warrant review of his prior records, and stated "I don't believe it's required. I think."  *Id.* at 124:14-25; *see also* CSMF ¶ 32 (citing Sofrado Dep. 124:14-25).  NP Sofrado testified, however, that doing so "probably" would have helpful for him to know whether Mr. Borroto had past suicide attempts when conducting his

---

[5] NP Sofrado did not have an independent recollection of doing the intake with Mr. Borroto. Sofrado Dep. 101:24-102:2.

evaluation, including in terms of whether he required any housing other than general population or for any medical referrals.  Sofrado Dep. 125:8-15.

Mental Health Counselor Patrice Maina,[6] a CFG employee, also performed a mental health evaluation on Mr. Borroto at approximately 3 p.m. on March 24, 2018.[7]  CFG SUMF ¶ 77 (citing Ex. Q); RSUMF ¶ 77.  Maina testified that it was her practice to look at prior medical records of inmates contained in the EMR.  CSMF (CFG) ¶ 33 (citing Ex. P, Maina Dep. 68:12-69:16).  However, the only "prior" records she reviewed for Mr. Borroto were the records of Nurse Kalinisan and NP Sofrado, not records from prior incarcerations.  *Id.* (citing Maina Dep. 157:25-158:19).  Ms. Maina recorded Mr. Borroto's prior suicide attempt by way of an overdose in 2013, noted his diagnoses of bipolar disorder and anxiety, and that he reported to be taking Cogentin and two other psychotropic medications.  CFG SUMF ¶ 78 (citing Ex. Q); RSUMF ¶ 78.  The mental health evaluation form completed by Ms. Maina indicates that Mr. Borroto denied auditory/visual hallucinations and suicidal/homicidal ideations.  *See* Ex. Q.  Ms. Maina testified that she did not refer him to a psychiatrist because Nurse Kalinisan had already made the referral.  RSUMF ¶ 82 (citing Maina Dep. 113:10-115:1.)

The record reflects that Mr. Borroto requested to see a psychiatrist repeatedly when he was being evaluated by Ms. Maina.  CSMF ¶ 39 (citing Ex. S, at HUD/BORROTO 00063-00067).`  In her notes, Ms. Maina characterized Mr. Borroto being "preoccupied [sic] with seeing a psyciatrist [sic]," but she only advised him how to contact mental health and told him that he was to see a psychiatrist the next day.  *Id.*  Ms. Maina testified "the standard practice" was to schedule a psychiatry visit for the following day, and that a crisis such as an inmate's

---

[6] Ms. Maina is not a defendant in this case.

[7] Ms. Maina did not have a personal recollection of doing the mental health assessment for Mr. Borroto.  Maina Dep. 84:17-25.

active suicidal thought or plan would be a reason to call the on-call psychiatrist; however, a prior suicide attempt or the inmate's requests to see a psychiatrist would not be reasons to place a call to the on-call psychiatrist.  Maina Dep. 144:20-149:6.

### f.  The Conflicting Evidence Regarding the Criteria for Placing an Inmate on Suicide Watch and Who Had Responsibility for Making that Decision

The County and Medical Defendants dispute who had the responsibility to place Plaintiff on suicide watch.  Kalinisan testified that as the initial intake nurse, she did not make the determination as to where the inmates she assess are housed, whether in general population or specialized housing.  She testified that inmates have to go to medical first to be seen by the nurse practitioner.  CSMF (CFG) ¶ 34 (Ex. N, Kalinisan dep. 54:23-55:12).  Kalinisan could not recall if she recommended Mr. Borroto's placement in general population, as listed on the intake form. *Id.* at 91:2-92:10.  Relying on Kalinisan's testimony, the County Defendants contend that only the nurse practitioner or mental health counselor makes housing determinations, *see* County SUMF ¶ 9 (citing Kalinisan Dep. 55:5-12), and that Sofrado and Maina were the only two individuals who were "capable" of determining that Mr. Borroto should be placed on suicide watch, but did not do so.  County SUMF ¶ 12.  Plaintiffs agree with the County Defendants that Sofrado and/or Maina should have placed Mr. Borroto on suicide watch but disputes the County Defendants' claim that these individuals were the only persons who capable of doing so.  *See* RSUMF (HCCC) ¶ 12.

CFG Director of Corrections Rahaman testified that the initial recommendation for housing disposition is made by the nurse in receiving screening.  CSMF ¶ 35 (citing Rahaman dep. 114:3-10).  If the patient needs to be seen by a provider because the nurse has some concerns, then that patient is referred to the provider, who would then make the decision.  *Id.*  NP Sofrado testified that from the records it appeared that intake nurse Kalinisan determined Mr.

Borroto's housing disposition as "general population." CSMF (CFG) ¶ 36 (citing Sofrado Dep. 99:10-20).

Kalinisan agreed that part of her assessment is to determine whether the inmate is suicidal. *See* Kalinisan Dep. 83:7-11. If an inmate were suicidal, Kalinisan testified that she would indicate it on the form and "would write it in the priority and put it there that the inmate is suicidal, needs one to one." *Id.* at 83:12-18. Kalinisan further testified that she could recommend one on one suicide watch, but "it still goes to the NP, it's up to him, but, you know." *Id.* at 83:19-23.

Kalinisan testified that the suicide protocol at HCCC required her to place an inmate on one-to-one suicide watch (or constant watch) only if the inmate stated he was suicidal (or was physically attempting to commit suicide):

> Q.    Did you recommend a one to one suicide watch for Mr. Borroto?
>
> A.    No, because he said he is not suicidal.
>
> Q.    And that's the only reason why you didn't recommend it, because he told you he wasn't suicidal?
>
> A.    Yes. That's the  -- that's the protocol there, current, you know?
>
> Q.    So all these other questions that ask you things about, like his prior suicide attempts, his psychiatric hospitalization history and his medication, if – how do those play into whether or not you determine if someone is suicidal?
>
> A.    They verbalize it or they – or sometimes they physically act on it.

*Id.* at 84:4-20. Kalinisan testified that the additional questions were relevant to classification, for custody, but that Kalinisan did not make these determinations. *Id.* at 84:21-86:13. When asked if she could make any recommendations as to where inmates are placed, Kalinisan testified that she can if the inmate says "I'm going to kill myself now, so then we put them  -- I can recommend one to one. But if he did not say that, then we can't." *Id.* at 86:14-19.

In contrast, CFG Medical Director Rahaman testified that "anybody, a custody officer, a nurse, a social worker, anybody in a jail can put a patient on watch if they feel that patient is going to harm themselves or they're unsafe." Rahaman Dep. 113:24-116:10. When asked if CFG educated nursing staff that only acutely suicidal inmates should be placed on watch, Rahaman answered in the negative:

> No. As I said before, there is acutely suicidal, which is a constant watch. There is expressing suicidal ideation, which can be a close watch. The 15-minute staggered watch. There is just somebody not feeling right about a patient and they want to put them on a watch until they get evaluated. Anybody can do that. So no, CFG does not educate anyone that only suicidal patients go on a watch.

Rahaman Dep. 116:12-117:2.

Kalinisan testified, however, that she could not recommend lower levels of suicide watch, "Only the immediate thing." Kalinisan Dep. at 87:1-7; 89:15-20. According to Kalinisan, an inmate's placement on lower levels of observation was up to the nurse practitioner. *Id.* at 87:8-15. Kalinisan also testified that it was her understanding that inmates could be placed on three different levels of suicide watch at HCCC, and she did know that she could recommend "constant watch" if an inmate was immediately suicidal. Kalinisan Dep. 89:6-20. Later in her deposition, Kalinisan reviewed the Hudson County Suicide Protocols, and she continued to maintain she could only place an inmate on constant watch. *Id.* at 111:10-113:1. Kalinisan also testified that if she had known she could have placed Mr. Borroto on a lower level of suicide watch, she would have done so. *Id.* at 116:3-13.

NP Sofrado testified that as part of the intake process he is required to screen for possible suicidal tendency, and as part of that determination, he asks the inmate if the inmate wants to hurt himself and observes if they appear depressed, anxious, or disheveled. CFG SUMF ¶¶ 70-71 (citing Sofrado Dep. 74:4-19); RSUMF ¶¶ 70-71. Sofrado testified that the inquiry is not over

if the inmate states that he does not want to harm himself. Sofrado Dep. at 74:20-25. However, when asked how he would determine whether an inmate needed to be placed on suicide watch, NP Sofrado, like Kalinisan , answered that "If they would have told me if they are suicidal." *Id.* at 77:6-11. Shortly thereafter, the following exchange occurred:

> Q.    Would you as a provider, intake personnel person, would be
>        able to recommend suicide watch if you felt that an inmate
>        was suicidal after doing your assessment?
>
> A.    If they say so, yes.
>
> Q.    You would have not – go ahead.
>
> A.    If they are saying they are suicidal, of course you have to
>        put them on suicide watch.

*Id.* at 78:5-12. Sofrado also testified that he did not know whether it was common for people who are suicidal to deny that they are suicidal. *Id.* at 75:7-11. NP Sofrado also testified that he could refer inmates to a staff psychiatrist "if they needed to" but agreed that he did not refer Mr. Borroto because he already had a mental health referral from Nurse Kalinisan. Sofrado Dep. 123:12-22.

Ms. Maina testified that she assesses an inmate for suicidality during the mental health intake assessment and that the nurse and the provider also assess the inmate for suicidality. Maina Dep. 62:6-21. Maina testified that she is authorized to recommend suicide watch based on the mental health assessment and received training regarding the meaning of suicide watch at HCCC. *Id.* at 63:9-23. Ms. Maina knew there were different levels of suicide watch but could not recall the names of the different levels. *Id.* at 63:24-64:20.

In her deposition, Ms. Maina testified that a person <u>cannot</u> be suicidal if they verbally deny having suicidal thoughts and plans:

> Q.     Yes, okay. Can a person deny having suicidal thoughts and plans, but, in fact, be
>        suicidal?
>
> A.     No. They denied.

> Q.    So if they verbally deny it that means they are not suicidal?
>
> A.    If they verbally deny they are not suicidal, they are not at the time, deny it and they are not suicidal, yes.

Maina Dep. 49:14-22.  Ms. Maina also testified that prior suicide attempts by a patient/inmate is "part of their history," but is not a "current risk" for determining suicidality.  CSMF ¶ 40 (citing Ex. P. Maina Dep. 125:1-21).  Ms. Maina also testified that had she known Mr. Borroto had threatened to jump off a bridge to the police prior to his arrest, this information would not have affected her evaluation or caused her to place him on a suicide watch.[8]  CSMF ¶ 41 (citing Ex. P, Maina dep. 133:19-137:7).  She testified that when she assessed Mr. Borroto, he denied it [i.e., being suicidal] and "based on that" she did not recommend a watch for him.  Ex. P, Maina Dep. 133:19-137:7.

### g.  Suicide Prevention Policies and Training at HCCC

CFG Director of Corrections, Denise Rahaman, testified that CFG's suicide prevention policies are based on the national standards promulgated by the National Commission on Correctional Health Care ("NCCHC").  CFG SUMF ¶ 114 (citing Rahaman Dep. 25:24-25; 26:1-3.)

Kalinisan testified that she received yearly mandatory in-service training on suicide prevention by both Hudson County and CFG, where "they covered almost everything," including training on suicide protocols.  Kalinisan Dep. 97:2-18; 103:18-104:1.  With respect to suicide prevention, Kalinisan testified that she received classroom training, with a teacher, and had to take a written test that she gave to the director of nursing.  *Id.* at 101:2-102:7.  Later in her

---

[8] It is unclear if Ms. Maina answered "no" because she was refusing to answer a hypothetical question or because would not have placed Mr. Borroto on suicide watch even if she knew he has threatened to jump off a bridge prior to his arrest; however, the Court views this testimony in the light most favorable to Plaintiffs and takes her statements at face value.

deposition, Kalinson clarified that CFG and Hudson County conducted separate but "[s]omewhat similar" trainings.  CFG provided the classroom training with the testing that was reviewed but not always graded.  Hudson County provided an annual training that she could complete online. Kalinisan Dep. 118:22-121:1.  Kalinisan  testified that she was trained to look for characteristics of inmates who were at risk of suicide, including mental illness and substance abuse.  Kalinisan Dep. 110:3-111:9.  When asked whether she was trained regarding the three levels of suicide watch, Kalinisan stated: "We are more focused on the one to one suicide watch, constant watch," i.e. those in immediate danger, and clarified that by "we", she meant staff in general. *Id.* at 111:10-112:8.

Kalinisan could not remember if she was trained about "close watch," which is used for inmates with a less immediate threat of suicide, and consists of "a variable type of observation", which prevents inmates from predicting when an officer will observe them, restricts the ability of an inmate to obstruct the view of their cell door window, and permits clothing, a blanket, and other items at the discretion of the mental health provider.  *See id.* at 113:2-115:3.  Kalinisan  did not recall being trained with respect to the option of "psychiatric observation", a type of suicide watch for those inmates in need of greater supervision than inmates in the general population. *See id.* at 115:5-13.  Kalinisan  further testified that she would have placed Mr. Borroto on "psych observation", but she believed that the inmate had to be assessed by a mental health counselor who would make that recommendation.  *Id.* at 121:2-22.

Sofrado testified that he was trained on how to screen inmates for suicide risk and received yearly in-person training on suicide prevention, but he could not recall who gave the training or any specifics about the substance of the training.  Sofrado Dep. 50:7-54:18.  Sofrado also testified that he did not have training regarding the psychotropic medications which Mr.

Borroto reported he was taking. CSMF ¶ 39 (citing Sofrado Dep. 132:15-35). When asked about the consequences of the abrupt stoppage of psychotropic medications and whether he had any training about withdrawal from psychotropic drugs, he answered: "Well, those are psych meds. I don't know those psych meds. I only specialize in adult medical help. Okay, you know." *Id.*

Ms. Maina also testified that CFG and HCCC each provided annual training. Maina Dep. 50:21-51:6; *id.* at 56:2-8. Ms. Maina testified that she was not provided any specialized training regarding the heightened risk of suicide for inmates as opposed to the risk of suicide for the non-incarcerated population, and that she did not believe that there was any difference in suicide risk between the two groups. Maina Dep. 41:20-44:1.

### h. Mr. Borroto Commits Suicide by Hanging in Tier D 100 East After Placing an Obstruction in Front of his Cell Window

At the time of Mr. Borroto's incarceration, the HCCC had an intake holding area called "Tier D 100 East" for inmates awaiting final classification and housing placement. CSMF (County) ¶ 52 (citing Edwards Dep. 121:15-21; Ex Q, Officer Martinez Dep. 24:5-11). HCCC also had a separate holding location for men with mental health needs or where men with mental health needs could be placed in medical under observation. CSMF (County) ¶ 53 (citing Edwards Dep. 119:10-120:8; Martinez Dep. 24:12-25:11). Based on the assessments of Nurse Kalinisan, NP Sofrado, and MHC Maina, Mr. Borroto was placed in general population intake housing, i.e., Tier D 100 East, rather than into specialized housing for inmates with mental health needs, and without any level of suicide watch. CSMF ¶ 54 (citing Edwards Dep. 121:15-25).

At the time of Mr. Borroto's incarceration, there was a policy and procedure in place at HCCC prohibiting inmates from blocking the windows of their cells. Corrections officers were responsible for removing obstructions inmates placed over their windows. CSMF ¶ 55 (citing

Martinez Dep. 33:1-34:9; Edwards Dep. 152:18-153:8; 166:12-15).  There was also a policy and procedure in place requiring the corrections officer on duty to conduct staggered cell checks, which involved walking around and making sure the officer looks into cells through the windows to see, listen, or smell if anything is going on in the cell.  CSMF ¶ 56 (citing Martinez Dep. 28:14-30:11).

Corrections Officer Jesus Martinez, who was stationed on Tier D 100 East at the relevant time, testified that he was trained regarding cell checks. He testified that, pursuant to his training, it is okay to do a visual check under certain circumstances, which meant to visually survey the area, look around, and try to conduct a walking cell check later.  CSMF (County) ¶ 57 (citing Martinez Dep. 96:13-99:17).  Director Edwards and Officer Martinez both testified that in practice inmates are allowed to block their cell windows for "privacy reasons," and Edwards called the policy of requiring inmates to remove obstructions "unenforceable."  CSMF ¶ 58 (citing Edwards Dep. 166:12-15; Martinez Dep. 34:1-9).

CCTV video from Tier D 100 East on the morning of March 25, 2018 shows that at 8:55:06 a.m., Mr. Borroto walks into his cell and closes the door.  CSMF (County) ¶ 59.  At 8:55:12 a.m., Mr. Borroto begins to hang something over the window to his cell.  *Id.*  (citing Martinez Dep. 76:10-77:1).  At approximately 9:03 a.m., Officer Martinez walks over to the TV to change the channel, which is hanging on the balcony directly above Mr. Borroto's cell. Although Officer Martinez is directly in view of Mr. Borroto's cell door, he does nothing to remove the obstruction.  CSMF (County) ¶ 60 (citing Martinez Dep. 78:10-19).  At 9:05:34 a.m., Officer Martinez returns to change the channel on the TV, and again does nothing to remove the obstruction. (CSMF (County) ¶ 61 (citing Martinez Dep. 79:8-20).  At 9:11:06 a.m., Officer Martinez approaches Mr. Borroto's cell to escort him to his appointment with the psychiatrist.

He calls and gets no answer.  Officer Martinez calls again, and again gets no answer.  At that point he opens the door and discovers Mr. Borroto hanging from the top bunk, unresponsive, having used the laundry bag string as a noose.  CSMF ¶ 62 (County) (citing Martinez Dep. 80:2-19; 87:9-88:2).

Plaintiffs notes that prior to Mr. Borroto's death, as part of the mortality and morbidity review process for previous suicides, CFG raised concerns about providing laundry bags with strings to inmates, which were the mechanism for committing suicide on more than one occasion at HCCC.  CFG Corrections Director Rahaman testified that "[t]here were recommendations made to custody about elements that should not be in place if you want a successful suicide prevention program, and it was ignored until after Mr. Borroto's suicide."  Rahaman clarified that she was referring to the laundry bags with strings given to inmates.  CSMF (County) (citing Rahaman Dep. 73:17-74:8).

### i. The County Terminates its Contract with CFG and takes Corrective Action after Mr. Borroto's Death

After Mr. Borroto's death, it is undisputed that the County terminated its contract with CFG.  CSMF (County) ¶ 17 (citing Ex. X).  A Mortality and Morbidity Review ("MMR") was conducted after Mr. Borroto's death, and a "corrective action plan" was made indicating the following corrective actions taken in response to Mr. Borroto's death.  CSMF (CFG) ¶ 42 (citing Ex. V, Mortality and Morbidity Review; Ex. M, Rahman dep. 103:20- 104:14).  All inmates admitted to the facility with a history of suicidal attempts, cleared from the ER for psychiatric reason, or cleared by a psychiatric facility must be placed on a minimum 72 hour close watch. *See id.* (citing Ex. V).  Other corrective actions include initiating "order types" in the electronic medical record system for 3 levels of watch.  New Work flows were implemented requiring the first medical provider to identify signs of suicidal ideation or past history of suicidal attempts

must place a "pop up alert" in the patient's file to identify them as a risk. *Id.* Medical and custody to review policy on psychiatric medication administration and medication verification process, re-education, continued monitoring for compliance. *Id.*

### j. The Investigation by the Medical Review Panel and Dr. Simring

In addition, after Mr. Borroto's death, Hudson County commissioned an investigation and review by their Medical Review Panel ("MRP") of the health care services provided to Mr. Borroto while in custody at HCCC. CSMF (CFG) ¶ 43 (Ex. W; Ex. K, Aviles Dep. 8:4-19, 64:23-65:24). The MRP concluded that NP Sofrado and MHC Maina deviated from accepted medical standards of care. CSMF (CFG) ¶ 44 (citing Ex. W at HUD/BORROTO 00437-00438). Specifically, the MRP found that Mr. Sofrado deviated from accepted nursing and medical standards of care when he failed to obtain a more detailed medical history, review prior medical record, perform a proper mental health and suicide risk assessment, and order some level of monitoring or suicide watch. CSMF (CFG) ¶ 45 (citing Ex. W at HUD/BORROTO 00437-00438). The MRP also found that Ms. Maina deviated from accepted medical standards of care when she failed to perform a proper mental health and suicide risk assessment, make an immediate referral to the staff psychiatrist, and order some level of monitoring or suicide watch. CSMF (CFG) ¶ 46 (citing Ex. W at HUD/BORROTO 00437-00438).

At the request of Hudson County and their MRP, a separate investigation and review was conducted into the death of Mr. Borroto by Dr. Steven Simring, MD, MPH. CSMF ¶ 47 (citing Ex. W at HUD/BORROTO 00517-00528). Dr. Simring was asked to comment on the factors that led to Mr. Borroto's death and evaluate the healthcare he received. Dr. Simring provided a report dated January 29, 2019, which found that there was more than enough evidence to place Mr. Borroto on suicide watch by Nurse Kalinisan, Nurse Practitioner Sofrado and by Mental

Health Counselor Maina. CSMF (CFG) ¶ 47 (citing Ex. W at HUD/BORROTO 00517-00528).

Dr. Simring specifically found that Nurse Kalinisan

> failed to appreciate the seriousness of the symptoms Mr. Borroto
> was presenting. She knew that he had several serious psychiatric
> diagnoses and a relatively recent suicide attempt.  He had just been
> admitted to the jail, which is a particularly high risk time for
> suicide.  Despite a lack of education or training, Mr. [sic] Kalinisan
> determined that Mr. Borroto was not an acute risk and did not
> require special observation.

CSMF (County) ¶ 65 (citing *id.* at HUD/BORROTO 00517-00528).  Dr. Simring further

determined that Nurse Kalinisan was "clearly untrained, unqualified and unequipped to do even a

basic screening." *Id.*

Dr. Simring further found that Mr. Borroto was kept in unsafe housing conditions, and

determined that newly admitted inmates should not be left unattended in a cell with a potentially

lethal object, such as a laundry bag with string.  Dr. Simring concluded that Mr. Borroto's cell

window should not have been allowed to be blocked and that he should not have had access to

material that can be used as a noose.  CSMF (County) ¶ 66 (citing *id.* at HUD/BORROTO

00527). 65-67).  Dr. Simring concluded:

> It is my opinion, to reasonable degree of medical
> probability, that Carlos Borroto was improperly evaluated and
> treated by the HCCC from the day he arrived.  As a result of this
> neglect, he committed suicide on the second day he was there.  For
> the following reasons, it is my opinion that the HCCC failed to
> provide adequate services to Mr. Borroto.  It is my opinion to a
> reasonable degree of medical probability, that these failures led
> directly to Mr. Borroto's death by suicide.

CSMF (County) ¶ 67 (citing *id.* at HUD/BORROTO 00521).

### k.  The Expert Reports

To support their claims against the County and Medical Defendants, Plaintiffs obtained

an expert in psychiatry in correctional institutions, Dr. Richard Hayward, and he prepared a 24-

page expert report, which found seven separate deficiencies in the suicide prevention protocols at

HCCC, as summarized below:

> [1] the Hudson County jail and CFG failed to develop a
> comprehensive risk assessment and suicide prevention plan. Mr.
> Borroto had a history of multiple indicators of elevated suicide risk
> and these were mostly ignored by the intake nurse [HCCC
> employee], the nurse practitioner [CFG employee] and the mental
> health counselor [CFG employee]. The suicide prevention plan at
> the Hudson County jail operated on an all or nothing principle
> regarding suicide risk, failing to recognize that individuals with a
> history of suicidal behavior will always have an elevated risk of
> suicide. [2] CFG failed to provide minimally adequate behavioral
> health treatment to Carlos Borroto in the Hudson County Jail
> despite his extensive history of mental health problems and
> elevated suicide risk. [3] The Hudson County jail and CFG failed
> to develop and implement an effective suicide assessment protocol
> and failed to identify Mr. Borroto's elevated risk of suicide. [4]
> The Hudson County jail and CFG failed to implement an effective
> suicide risk assessment protocol that included competent and
> supervised mental health clinicians. [5] CFG failed to provide
> sufficient supervision of the mental health clinician regarding
> suicide prevention and the need for mental health treatment. [6]
> There was no common practice of transferring inmates requiring
> more extensive mental health assessment and treatment from
> Hudson County Jail to an acute care facility for psychiatric
> evaluation and initiation of appropriate treatment. [7] The
> deficiencies of the Palisades Medical Center clearance procedures,
> the Hudson County jail and CFG as summarized above contributed
> substantially to the suicide of Carlos Borroto.

CSMF (CFG) ¶ 48 (citing Ex. Y).

In his report, Dr. Hayward explained that the NCCHC essential Standard MH-G-04,

Suicide Prevention Program, "describes three levels of risk that include acutely suicidal, non-

acutely suicidal and no suicide precautions."  Report at 12.  Mr. Hayward opined that "[Mr.]

Borroto exceeded the criteria for non-acutely suicidal due to his documented history of suicidal

behavior in addition to his multiple risk factors" and "[a]t a minimum, Mr. Borroto should have

been placed on Psychiatric Observation.  That status would have alerted the correctional officers

to provide housing with increased monitoring and observation." Ex. Y at 12-13. Dr. Hayward

opined that Mr. Borroto

> had an elevated risk of suicide in 2018 based on his history of
> suicidal behavior including his prior ideation, his prior overdose,
> his history of problems with depression and anxiety, his mental
> health treatment, his recurrent psychiatric hospitalizations, his
> misuse of PCP, his problems with impulse control and his ongoing
> struggle to develop a viable plan for improving his multiple life
> problems.

*Id.* at 17.

Dr. Hayward also opined that CFG had deficient protocols for determining suicide risk:

> Since CFG had not developed a protocol for determining
> suicide risk status based on a review of significant risk factors, the
> health care clinicians relied primarily on the inmate's statements
> that he was or was not suicidal. All of the clinicians that evaluated
> Mr. Borroto relied on his statements that he was not currently
> suicidal and they neglected to initiate any suicide precautions. This
> practice resulted in a functional protocol of an all or nothing
> suicide risk status, with no precautions for monitoring those
> inmates who verbally denied that they were suicidal. After Carlos
> Borroto was assessed by mental health counselor Maina and
> determined to not require Suicide Watch, there was no plan for
> subsequent monitoring by correctional officers and nursing staff,
> and no provision for housing him in a suicide resistant
> environment with improved observation capabilities. A suicide
> prevention program with sufficient assessment of elevated risk
> levels would have determined that Carlos Borroto continued to
> have a significantly elevated risk status.

*Id.* at 13.

Plaintiffs also obtained an expert in Correctional Healthcare and Correctional

Management to opine on HCCC's actions as the custodian of Mr. Borroto. Paul M. Addee

provided an expert report in which he opined as follows:

> 1. The failure of the Hudson County Correctional Center to
> require the arresting or transporting officers to provide intake
> personnel with current information regarding Mr. Borroto's
> suicidal ideations and threats, just prior to his arrest, created an
> unreasonably dangerous condition that caused his death. 2. The
> Hudson County Correctional Center's failure to have a policy
> regarding ascertaining critical information regarding Mr. Borroto's

current suicidality or known injuries from arresting/transporting officers, so that informed decisions could be made by correctional officers, classification personnel, and health care professionals regarding his housing assignment and safety precautions, created an unreasonably dangerous condition that caused his death. 3. Had the Hudson County Correctional Center followed the proper protocols and standard of care for Mr. Borroto's intake, Mr. Borroto could have received an appropriate medical, mental health, and suicide prevention screening and assessment, and an informed and appropriate inmate classification and housing assignment could have been made. Had this occurred, the subject incident would have been prevented and Mr. Borroto's death would not have occurred."

CSMF ¶ 69 (County) (citing Ex. Z).

Plaintiffs also retained an expert who signed an Affidavit of Merit in this matter on January 20, 2020, which was served upon Dr. Santos and Palisades Medical Center. *See* ECF No. 88-5, Ex. D, Anderson Affidavit of Merit. Plaintiffs have provided evidence that Dr. Anderson is a Board Certified psychiatrist who practices and practiced in the specialty field of psychiatry at the time of the alleged malpractice in March 2018. (*See* Ex. D; Ex. E and Ex. G 8:11-21). Dr. Santos testified in his deposition that he is board eligible in psychiatry but is not board certified in any area of psychiatry. *See* Santos Dep. 46:3-47:19.

The County defendants obtained an expert Mr. Peter Perroncello, who testified that Ms. Kalinisan as the intake nurse should have placed a "red flag" on Mr. Borroto's file. This red flag should have required Mr. Borroto to be placed in housing with constant observation until he was cleared by a clinician. CSMF (CFG) ¶ 70 (citing Ex. R, Perroncello Dep. 150:5-157:13).

The Medical Defendants' expert Dr. Sherif Soliman, M.D. also issued an expert report regarding the care rendered to Mr. Borroto at HCCC. Mr. Soliman opined that Mr. Borroto's death by suicide was not reasonably foreseeable and the decision to treat his psychiatric illness in the least restrictive setting of general population was a reasonable exercise of professional judgment. *See* CFG SUMF ¶¶ 123-124 (citing Ex. K). Dr. Soliman opined that "the treatment

team at CFG was aware that Mr. Borroto had been evaluated and psychiatrically cleared for incarceration on March 23, 2023.  Dr. Soliman further opined that it was reasonable to rely on this psychiatric clearance to indicate that in the judgment of a fully trained physician specializing in psychiatry, Mr. Borroto did not pose an imminent risk of suicide."  Ex K. at 13.  Dr. Soliman opined that Mr. Borroto's static or fixed risk factors for suicide, such as past suicide attempts, male gender, and prior psychiatric hospitalizations, while relevant, would not have caused a reasonably prudent practitioner to place Mr. Borroto on suicide precautions.  *Id.* at 16.  He further opined that it was reasonable to conduct three intake assessments that inquired about thoughts of suicide, initiate mental health services within twenty-four hours after admission after psychiatric clearance, and schedule an appointment with a psychiatrist.  *Id.* at 17.

The Medical Defendants also submitted an expert report by Renee Dahring, MSN, APRN, and CPN.  Ms. Dahring opined that CFG's suicide prevention policies complied with NCCHC standards.  *See* Ex. N at 1-3.  Ms. Dahring also opined that Mr. Borroto received all mandated screenings and assessments and they were timely under the NCCHC standards.  *Id.* at 5.  Ms. Dahring also opinioned that NP Sofrado used reasonable clinical judgment in creating a plan for Mr. Borroto and that Ms. Maina, as a trained mental health counselor, was qualified to conduct a mental health screening, conducted the screening in a timely manner, and used reasonable clinical judgment in finding that Mr. Borroto was not suicidal and referring him to a psychiatrist.  *Id.* at 4-5.

### l.   Relevant Procedural History

Plaintiffs filed their Complaint on or about August 23, 2019.  (ECF No. 1.)  On September 15, 2023, the matter was transferred to the undersigned.  ECF No. 70.

After the close of discovery and a settlement conference, which was unsuccessful, the Defendants separately moved for summary judgment.  PMC moved for summary judgment on January 8, 2024.  ECF Nos. 77.  The Medical Defendants, the County Defendants, and Dr. Santos each moved for summary judgment on January 26, 2024.[9]  ECF Nos. 78, 79, 80.  On March 27, 2024, Plaintiffs filed their opposition papers to PMC's motion.  ECF No. 88-89.  On April 2, 2024, Plaintiffs filed their opposition papers to the summary judgment motions filed by the Medical Defendants, the County Defendants, and Dr. Santos.  ECF Nos. 89-93, 95.  PMC filed a reply brief on April 5, 2024.  ECF No. 96.  CFG filed a reply brief on April 29, 2024. ECF No. 98.  On May 5, 2024, the County Defendants filed a reply brief.  ECF No. 101.  The motions for summary judgment are fully briefed and ready for disposition.

### II.   <u>STANDARD OF REVIEW</u>

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *United States v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (citing *Thomas v. Cumberland Cnty.*, 749

---

[9] Although the Medical Defendants did not assert cross claims against the County Defendants and did not move for summary judgment against them, the County Defendants filed an "opposition brief" to the County Defendants' motion for summary judgment as to Plaintiffs' Complaint.  The Medical Defendants filed a response.  (*See* ECF No. 90.)  Because the County Defendants' opposition to the Medical Defendants' motion for summary judgment is improperly filed, the Court does not consider these submissions.  The Medical Defendants also filed a motion to amend on April 29, 2024, to add cross claims against the County Defendants, which remains pending.  (ECF No. 99.)  The County Defendants oppose that motion.  (ECF No. 100.)

F.3d 217, 222 (3d Cir. 2014); *see also* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (quotations omitted); Fed. R. Civ. P. 56(a).

It is well established that the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323 (internal citation omitted). The moving party may also meet its burden by "showing — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) (quotations and citations omitted).

Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "If reasonable minds could differ as to the import of the evidence," summary judgment is not appropriate. *See id.* at 250-51. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary

judgment shall be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986) (citation omitted).

III.     **ANALYSIS**

    **a. The Challenges to the Relevance and Reliability of Plaintiff's Expert Reports and Testimony Require the Parties to File Daubert Motions**

    The Court begins by noting that Defendants have not filed motions to exclude or limit

Plaintiff's experts pursuant to *Daubert v. Merrill Dow Pharmaceutical, Inc.*, 509 U.S. 579, 589

(1993). Instead, they attempt to litigate the *Daubert* issues (and other evidentiary issues) in their

motions for summary judgment. Specifically, the Hospital Defendants contend that Dr.

Anderson's expert report should be precluded on the papers as a "net opinion." In their reply

brief, CFG similarly argues that the Court should disregard Dr. Hayward's expert report because

it is a "net opinion" and fails the standard for admissibility set forth in *Daubert*.

    In federal court, the admissibility of expert testimony is governed by Federal Rule of

Evidence 702, which was amended in 2000 to reflect the Supreme Court decision in *Daubert*.

The Rule reads as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Under this rule, courts act as a "gatekeeper" to ensure that expert testimony is

both relevant and reliable. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). Rule

702 has a "'liberal policy of admissibility.'" *Id.* (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128

F.3d 802, 806 (3d Cir. 1997)). To be admissible, expert testimony must satisfy three

requirements under Rule 702: (1) the witness must be qualified as an expert; (2) the expert must

be reliable; and (3) the expert's testimony must assist the trier of fact or "fit." *Id.* at 806 (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994)); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (Rule 702 provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit.").

Plaintiff argues that summary judgment is not the vehicle for analyzing the admissibility of expert testimony, and that the Court should not preclude the Plaintiff's experts on the papers without first holding a Rule 104(a) hearing. Indeed, the Third Circuit has cautioned courts that expert challenges under *Daubert* require full development of the facts and evidence to provide the parties with a full opportunity to be heard on the issue. *See In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 855 (3rd Cir. 1990) (holding exclusion of expert evidence provided grounds to set aside grant of summary judgment where plaintiffs did not have an in limine hearing and were denied oral argument on evidentiary issues); *see also Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 417–18 (3d Cir. 1999) (holding that the district court abused its discretion in excluding an expert's opinion without conducting an in limine hearing focused on the *Daubert* reliability of his testimony).

Moreover, the Court finds that the briefing of the *Daubert* issues is inadequate. Dr. Santos relies on state law, and the Medical Defendants raise their *Daubert* arguments in their reply brief. Although courts are not required to hold a hearing on expert admissibility, a motion for summary judgment should be denied as premature if "made before [a court] has had the opportunity to hold a *Daubert* hearing and consider the admissibility of Plaintiff's proffered expert testimony." *McConaghy v. Sequa Corporation*, 294 F. Supp. 2d 151, 168 (D.R.I. 2003) (noting a Daubert motion is the proper vehicle for challenging an expert's admissibility and denying defendant's summary judgment motion as premature); *Tony Gerard Associates, LLC v.*

*QBE Specialty Insurance Company*, 14-2412, 2016 WL 2727037, at *3 (D.N.J. May 9, 2016) (same) (citing *Daubert*, 509 U.S. at 589); *Martin v. Blaser Swisslube, Inc.*, No. 03–6116, 2005 WL 3454291, at *7 (D.N.J. Dec. 16, 2005) (same); *Taylor v. Jersey City Medical Center*, 2005 WL 3501877 (N.J. Super Law Div. 2005) (same).

The Court denies without prejudice the respective motions for summary judgment with respect to the *Daubert* challenges to Plaintiffs' expert testimony and permits the parties to file *Daubert* motions and seek a *Daubert* hearing prior to trial, if appropriate. Below, the Court considers the remaining arguments for summary judgment that are not premised on Rule 702 challenges to Plaintiff's expert reports or testimony.

### b. The § 1983 and NJCRA Claims Against the County and Medical Defendants

The Court next addresses the § 1983 and NJCRA claims[10] against the County and Medical Defendants, which are the basis for federal jurisdiction. In this section, the Court first considers the deliberate indifference claims against the Kalinisan and Sofrado followed by the *Monell* claims against the County and CFG.

### 1. Section 1983 and NJCRA Claims Against the Individual Defendants

Section 1983 creates a private right of action against any "person" who violates the plaintiff's federal rights while acting under color of state law. 42 U.S.C. § 1983. Mr. Borroto was a pre-trial detainee at the time of his suicide, and, thus, Plaintiffs' § 1983 and NJCRA claims are governed by the Due Process Clause of the Fourteenth Amendment, which prohibits the state

---

[10] The NJCRA protects federal rights and substantive rights under New Jersey's Constitution. *See Gormley v. Wood-El*, 218 N.J. 72, 97 (2014) ("Section 1983 applies only to deprivations of federal rights, whereas N.J.S.A. 10:6-1 to -2 applies not only to federal rights but also to substantive rights guaranteed by New Jersey's Constitution and laws."). The NJCRA is typically treated as the state court analog to § 1983. The parties have not argued that the standards for Plaintiffs' claims are different under § 1983 and the NJCRA, and the Court considers them together.

from punishing pretrial detainees. *See Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). In analyzing a pre-trial detainee's suicide, the Third Circuit relies on the Eighth Amendment standard, which prohibits the infliction of cruel and unusual punishment on convicted prisoners, as the due process rights of pre-trial detainees are at least as great as the Eighth Amendment rights of convicted and sentenced prisoners. *See id.*

The Eighth Amendment's ban on "cruel and unusual punishments" obligates prison officials to provide medical care to prisoners in their custody. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *see also Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994). A "particular vulnerability to suicide" is one type of "serious medical need" to which prison officials may not be deliberately indifferent. *Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017). As such, the suicide of a person in correctional custody may support recovery under 42 U.S.C. § 1983. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (citations omitted) ("Colburn II"). To recover on this theory, a plaintiff must show that state officials were deliberately or recklessly indifferent to the risk of suicide. *Farmer*, 511 U.S. at 828 (citations omitted).

To hold prison officials liable for failure to prevent a suicide, the plaintiff must establish that: (1) the inmate had a "particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility, that a suicide would be attempted;" (2) the prison officials "knew or should have known" of that vulnerability; and (3) those officers "acted with reckless or deliberate indifference" to the inmate's particular vulnerability. *Palakovic*, 854 F.3d at 223-24 (cleaned up). This test evolved from the test for deliberate indifference to serious medical need claims, but this more specific standard governs cases where the plaintiff alleges that prison officials are liable for an inmate's suicide. *See DeJesus v. Delaware through*

*Delaware Department of Corrections*, 833 F. App'x 936, 939–40 (3d Cir. 2020) (citing *Woloszyn*, 396 F.3d at 320 ("A particular vulnerability to suicide represents a serious medical need"); *see also Colburn*, 946 F.2d at 1023 (explaining that the definition of deliberate indifference to serious medical need, from *Estelle v. Gamble*, *supra*, "provided the theoretical underpinnings" for recognizing that particular vulnerability to suicide is a type of serious medical need).

A particular vulnerability to suicide "speaks to the degree of risk inherent in the detainee's condition." *Woloszyn*, 396 F.3d at 320 (cleaned up).  There must be a "strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Id.* (quoting *Colburn II*, 946 F.2d at 1024).  In cases involving corrections officers or other nonprofessionals, the Third Circuit has held that this "strong likelihood of suicide . . . [must also have been] so obvious that a lay person would easily recognize the necessity for preventative action." *Id.* (quoting *Colburn II*, 946 F.2d at 1025).

In *Palakovic*, the amended complaint alleged that the decedent "had been diagnosed with an array of serious mental illnesses, exhibited signs of depression, shared his suicidal thoughts with prison staff, and expressed a wish to die" and had been labeled as a suicide risk by the prison and nicknamed "Suicide" by fellow inmates.  The Third Circuit held that these facts were plainly sufficient to show a particular risk of suicide.  *See id.* at 229-230.  The Third Circuit explained, however, that its prior precedent did not require a showing that the "plaintiff's suicide was temporally imminent or somehow clinically inevitable."  Instead,  "[a] particular individual's vulnerability to suicide must be assessed based on the totality of the facts presented." *Id.* at 230.

The Medical Defendants contend that Plaintiffs fail to identify Mr. Borroto's particular vulnerability to suicide and claim that he "consistently presented as not suicidal to all medical and mental health personnel he encountered."  (ECF No. 80-4, Medical Def. Moving Br. at 9.) To

reach this conclusion, the Medical Defendants resolve disputed facts in their favor and ignore other disputed material facts. The totality of the facts presented shows that Mr. Borroto had a long and well-documented history of mental health diagnoses for which he was taking psychotropic medications, that he had past suicide attempts and had threatened suicide just prior to his admission at HCCC. He reported a past suicide attempt to Kalinisan at the time of his admission and his significant mental health history was documented in the EMR and his medical records from Palisades Medical Center. The Court is satisfied that there is sufficient evidence in the summary judgment record from which a reasonable juror could conclude that Mr. Borroto had a particular vulnerability to suicide, such that the risk went beyond mere possibility to a strong likelihood that self-inflicted harm could occur.

The Medical Defendants also contend that there is no evidence that Nurse Kalinisan and/or NP Sofrado knew that Mr. Borroto had a particular vulnerability to suicide. Under Third Circuit law, "[i]t is not necessary for the custodian to have a subjective appreciation of the detainee's particular vulnerability" to suicide. *Palakovic*, 854 F.3d at 231 (citing *Woloszyn*, 396 F.3d at 320). Instead, the Third Circuit has "held that 'reckless or deliberate indifference to that risk' only demands 'something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide.'" *Id.* (citation omitted). At issue is not whether the individual Defendants subjectively appreciated Mr. Borroto's suicidality. Instead, the issue is whether a reasonable jury could find that either of these Defendants acted with reckless or deliberate indifference to Mr. Borroto's particular risk of suicide.

Plaintiffs argue that there is sufficient record evidence showing that Kalinisan and Sofrado knew of Mr. Borroto's particular vulnerability to suicide even if neither knew that he had been threatening to kill himself just prior to his arrest. The Court agrees. The Third Circuit has

held that "prison officials 'know' of a particular vulnerability to suicide where they have had actual knowledge of a history of suicide attempts or a diagnosis identifying suicidal propensities." *Palakovic*, 854 F.3d at 230 (citing *Colburn II*, 946 F.2d at 1025 n.1); *Tatsch-Corbin v. Feathers*, 561 F.Supp.2d 538, 544 (W.D. Pa., 2008) (same); *Compare* with *Bingham v. Lancaster Cnty.*, 709 F.Supp.3d 176, 187 (E.D. Pa., 2024) (finding that the knowledge prong was not met where there was "no evidence that the[ ] [d]efendants knew about [the decedent's] history of suicidality, drug abuse, or mental health diagnoses.")

In *Palakovic*, for instance, the Third Circuit found that the plaintiffs sufficiently established a reasonable inference that prison officials and medical personnel "knew or should have known" of the decedent's particular vulnerability to suicide because the decedent's records, "which the corrections officers and medical staff must have—or, at the very least, should have—reviewed when considering both his treatment and whether or not to repeatedly place him in solitary confinement," contained information about prior suicide attempts, a label as a "suicide behavior risk" with a "Stability Rating D," multiple serious mental illness diagnoses, and inclusion on the "mental health roster." *Palakovic*, 854 F.3d at 230–31.

A reasonable jury could also determine that Kalinisan and/or Sofrado acted with reckless or deliberate indifference to Mr. Borroto's particular vulnerability to suicide. As explained by the Third Circuit, reckless or deliberate indifference to the risk that an inmate would commit suicide "only demands something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Palakovic*, 854 F.3d at 231 (citation omitted).

Here, there is sufficient evidence that Kalinisan was more than merely negligent to Mr. Borroto's particular risk of suicide when she failed to place him on any level of suicide watch and recommended him for general population based on the information known to her and the

information in Mr. Borroto's EMR, which was available for her review.  Although Kalinisan testified that she was unaware that Mr. Borroto was at risk of self-harm on March 24, 2018, the Court may not assess her credibility, and there is circumstantial evidence which suggests that Mr. Borroto's risk of suicide was or should have been readily apparent to a trained nurse.  Kalinisan knew that Mr. Borroto had prior suicide attempts and hospitalizations, that he was taking several psychotropic drugs which had not been verified, and that he had been diagnosed with bipolar disorder, schizophrenia, and ADHD.  The CFG Director of Corrections Denise Rahaman testified that intake screeners had access to and were supposed to review the prior EMR during intake, and Kalinisan admitted that she did not review Mr. Borroto's EMR.  Kalinisan also answered "no" to the question asking if arresting or transporting officers believed Mr. Borroto to be a suicide risk and admitted at her deposition that she never spoke to those officers.  Finally, Kalinisan also stated that she did not place Mr. Borroto on one-to-one suicide watch because he did not state that he was presently suicidal and she did not believe she could place inmates on a lower level of suicide watch.  Kalinisan 's testimony is again contradicted by Rahaman's testimony that any staff member could place an inmate on a lower level of suicide watch.  These facts are sufficient for a jury to find that Kalinisan  acted with reckless or deliberate indifference to Mr. Borroto's particular risk of suicide.

Similarly, there is sufficient evidence that NP Sofrado acted with reckless or deliberate indifference in failing to conduct a thorough assessment of Mr. Borroto's risk of suicide.  A reasonable jury could find that NP Sofrado was reckless in failing to review of Mr. Borroto's prior EMR and that he rubberstamped Kalinisan's recommendation that Mr. Borroto be placed in general population, and did not exercise professional judgment when he failed to place Mr. Borroto on suicide watch pending his referral to the psychiatrist.  A reasonable jury could find

that had Sofrado conducted a meaningful evaluation of Mr. Borroto's risk of suicide, he would have placed him on some level of suicide watch until Mr. Borroto could be evaluated by a psychiatrist.

Plaintiffs' expert witness Dr. Hayward opined that Mr. Borroto had multiple indicators of elevated suicide risk and that Kalinisan, Sofrado and Maina improperly ignored those risks. Whether Kalinisan and Sofrado's conduct was merely negligent, was the result of reckless or deliberate indifference, and/or resulted from policy or custom of CFG, as discussed in more detail in the next section, are questions of fact for a jury to determine.  The Court therefore denies summary judgment as to Kalinisan  and Sofrado on the Fourteenth Amendment deliberate indifference and NJCRA claims.

### i.   The *Monell* Claims Against the County and CFG

The County and Medical Defendants also move for summary judgment on the *Monell* claims.  In *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities are "person[s]" who may be sued under § 1983; however, municipalities are not vicariously liable for the constitutional torts of their employees or agents. *Id.* at 691–94.  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.  A municipality is liable under § 1983 when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation. *Colburn* II, 946 F.2d at 1027 (citing *Monell*, 436 U.S. at 691–95).

A municipality's failure to properly train its employees and officers can amount to a "custom" under § 1983.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  In that context,

"a plaintiff need not allege an unconstitutional policy." *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019). Instead, a plaintiff "must demonstrate that a [municipality's] failure to train its employees reflects a deliberate or conscious choice," *id.* (internal quotation marks and citation omitted), and is "closely related to the ultimate injury," *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014). That is, liability "requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Id.* at 222 (citing *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)). To be closely related to the ultimate injury, "the deficiency in training [must have] actually caused" the constitutional violation. *Id.* (citing *Canton*, 489 U.S. at 391). "In a prison suicide case, this means that the plaintiff must (1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." *Colburn II*, 946 F.2d at 1030.

From the outset, the County acknowledges that a breakdown in CFG's mental health screening process led to Mr. Borroto's suicide but nevertheless attempt to disclaim liability by claiming that mental healthcare was "solely in the purview of CFG."[11] Federal courts, however, have consistently held that while municipalities may outsource their jail-medical-care function to private companies, they have a non-delegable duty to provide inmates with medical care. *See West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the

---

[11] The County also ask this Court to find that CFG must indemnify them. This argument is premature, and the Court declines to consider it at summary judgment, which is focused on whether or not Plaintiffs' *Monell* claims survive against the County and CFG.

State of its constitutional duty to provide adequate medical treatment to those in its custody" and holding that a doctor who supplies prison medical services as an independent contractor can be sued as a "person" under § 1983). Just as a private contractor can be liable under § 1983 for constitutional violations, so too a municipality can be liable for their chosen contractor's unconstitutional customs and practices. *See e.g.*, *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ("The underlying rationale is not based on responde[a]t superior, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it."); *see also Nieto v. Kapoor*, 268 F.3d 1208, 1216 (10th Cir. 2001) ("Just as the outsourcing of prison medical care to a private contractor did not relieve the State of its constitutional duty under the Eighth Amendment to provide adequate medical treatment to those in its custody in *West*, hiring a private doctor here to perform supervisory duties does not relieve the State of its constitutional duty to provide equal protection under the 14th Amendment to its employees."); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1250 (6th Cir. 1989) (holding that the county "retains responsibility despite having contracted out the medical care of its prisoners."); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) (explaining that the obligation to provide medical care to incarcerated individuals is not non-delegable and "the county itself remains liable for any constitutional deprivations caused by the policies or customs" of the medical provider). New Jersey courts have likewise recognized that "[p]roviding adequate healthcare to inmates is a matter of federal constitutional compulsion." *Scott-Neal ex rel. Scott v. New Jersey State Dept. of Corrections*, 366 N.J. Super. 570, 576 (App. Div. 2004).

At issue is not whether the County itself promulgated an unconstitutional policy or custom but whether CFG had an unconstitutional policy or custom and otherwise satisfies the

*Monell* requirements.  "If it does, the County can be liable because [the medical provider] stepped into the County's shoes with the County's permission."  *Estate of Walter by and through Klodnicki v. Correctional Healthcare Companies*, Inc., 323 F. Supp.3d 1199, 1216 (D. Colo., 2018).  For this reason, the County is not entitled to summary judgment based on the fact that CFG created the relevant policies or custom that caused the violation of Mr. Borroto's rights and/or that CFG failed to train and supervise mental health screeners, leading to Mr. Borroto's suicide.

Even if the County could somehow escape liability if CFG were solely responsible for the mental health policies and practices, there is evidence that CFG policies were subject to final approval by Edwards, the Director at HCCC.  Moreover, the spike in suicides at HCCC were publicized in news articles, and there is evidence that the County, through Edwards, was aware of it and hired a medical monitor, but failed to implement the monitor's recommendations until after Mr. Borroto's suicide.  *See King*, 680 F.3d at 1021 (seven news articles and policymaker's admitted knowledge of reported problems permitted inference of deliberate indifference).

In opposing summary judgment, Plaintiffs argue that CFG was a moving force in causing Mr. Borroto's death in at least two different respects: 1) by maintaining an all or nothing suicide prevention screening regimen that failed to adequately account for prior suicidal history and 2) by failing to train and supervise its providers in assessing and promptly treating patients with serious mental health problems.[12]  (*See* ECF No. 91, Pl. Opp. Br. to CFG Motion at 11).

---

[12] Plaintiffs also contend that CFG failed to establish policies to ensure Mr. Borroto's access to a psychiatrist (or other qualified mental health provider) and his psychiatric medications.  (*See* ECF No. 91 at 12.)  "While [The Third Circuit has] recognized that a particular vulnerability to suicide qualifies as a serious medical need, . . . a vulnerability to suicide is not the sole need on which [a] claim [can be] focused."  *Palakovic*, 854 F.3d at 227 (citation omitted).  A plaintiff who alleges defendants were deliberately indifferent to his serious medical need must show that (1) he had a serious medical need, (2) defendants were deliberately indifferent to that need, and

Plaintiffs also argue that CFG adopted a custom or practice of allowing insufficiently trained staff to be sole decisionmakers regarding whether inmates entering the jail would be placed on suicide watch.  Plaintiffs further argue that Hudson County accepted CFG's practice of placing mental heath decisions in the hands of insufficiently trained staff and that Edwards, as the policymaker, failed to implement recommendations and corrective actions from the NRI and MRP regarding suicide prevention, patient assessment, and staff training.[13]

The Court finds that there is sufficient record evidence, including the testimony of Kalinisan, Sofrado, and Maina, by which a reasonable juror could conclude that CFG had a policy or custom of placing inmates on suicide watch only where that inmate verbalized that he was suicidal (or was actively attempting suicide), and that this custom or policy was a "moving force," *see Dodson*, 454 U.S. at 326, behind the alleged constitutional violation of deliberate indifference to a particular vulnerability to suicide.  Indeed, Kalinisan testified that the protocol at HCCC required her to place Mr. Borroto on suicide watch only if he stated he was suicidal.

---

(3) the deliberate indifference caused harm or physical injury to the plaintiff.  *See, e.g., Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003); *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987).  A deliberate indifference to a serious medical need claim can apply in various inmate medical situations, including failing to provide adequate mental health services.  *Palakovic*, 854 F.3d at 227-29, 231-32.  An analysis of a vulnerability to suicide claim focuses more narrowly on evidence showing a strong likelihood of suicide. *Id.* at 223-24.  CFG attempts to argue that Mr. Borroto received "some treatment," but the Court agrees with Plaintiffs that this argument is misplaced, as Mr. Borroto received no mental health treatment and merely received a suicide assessment and a referral to a psychiatrist.  Because the Medical Defendants have not sufficiently analyzed whether Plaintiffs state a *Monell* claim or claims for individual liability based on the denial of mental health care and his medications, the Court also denies summary judgment on this alternate theory of liability.

[13]  Plaintiffs list other deficiencies in HCCC policies that they view as contributing to Mr. Borroto's suicide, including failing to obtain information from transporting officers at booking, unsafe housing conditions, the issuance of laundry bags with strings, and the failure to discipline officers who permit inmates to block their cell windows.  The County has not sufficiently addressed whether these deficiencies would survive a *Monell* analysis, and the Court declines to do this analysis for them.  For that reason, they are not entitled to summary judgment on those claims.

Maina went so far as to say that an inmate could not be suicidal if he denied being suicidal and stated that she would not have placed Mr. Borroto on suicide watch even if she knew he had threatened to kill himself in the days prior to his admission.

Plaintiffs' expert Dr. Hayward opined, among other things, that Mr. Borroto had multiple indicators of elevated suicide risk that were mostly ignored by Kalinisan, Sofrado, and Maina. Dr. Hayward further opined that CFG's suicide prevention plan at HCCC operated on an all or nothing principle regarding suicide risk, which excluded from suicide watch all inmates who denied they were actively suicidal. A reasonable jury could find that Kalinisan, Sofrado, and Maina were not competent to assess Mr. Borroto's elevated risk of suicide due to CFG's failure to train staff to recognize that inmates who denied suicidal ideation may nevertheless have significant risk factors for suicidality, such as a prior history of suicides, hospitalizations, and mental health diagnoses, and should be placed on some level of suicide watch. A reasonable jury, viewing all the record evidence could find that the policies and customs of CFG and HCCC regarding suicide assessment and the placement of inmates on suicide watch were deficient and substantially contributed to the suicide of Mr. Borroto.[14]

For these reasons, the County and CFG are not entitled to summary judgment on Plaintiffs' *Monell* claims.

---

[14] In *Monell* cases, it is typically necessary to introduce evidence of a prior pattern of similar constitutional violations to show notice. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407–08 (1997). In some "rare" cases, the risk of unconstitutional consequences from a municipal policy "could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 64 (2011). The Court need not resolve this issue as Plaintiffs also put forth some evidence showing that the County and CFG were aware of problems with the suicide prevention protocols and with training and supervision of staff due to the NRI reports and the fact that three other detainees died by suicide in the months prior to Mr. Borroto's suicide.

### c. The Common Law Claims Against Nurse Kalinisan and NP Sofrado

The Medical Defendants argue that the common law claims against Nurse Kalinisan and NP Sofrado for negligence, wrongful death, and survivorship must be dismissed because Plaintiffs have not provided an expert on relevant standard of care and because other evidence of their negligence is inadmissible hearsay. The Court has determined that the § 1983 and NJCRA claims against Defendants Kalinisan and Sofrado survive summary judgment, and the common law claims are based on the same facts.[15] Plaintiffs argue that there is substantial record evidence of the appropriate standard of care for mental health in the jail suicide context, including the report and testimony of Dr. Hayward and Hudson County's post-mortem and MPR reports. As noted in the earlier section, the Medical Defendants' arguments regarding the admissibility of Dr. Hayward's report and testimony are premature and must be challenged in a *Daubert* motion. To the extent Plaintiffs seek to offer the post-mortem and MRP reports for the truth of the matter asserted at trial and not for another purpose, the Medical Defendants may move *in limine* to exclude the reports on hearsay grounds. The motion for summary judgment as to the common law claims against Kalinisan and Sofrado are denied without prejudice at this time.

The Court also denies without prejudice the Medical Defendants' motion for summary judgment on the punitive damages claims. Punitive damages may only be awarded when "the defendant's conduct is shown to be motivated by evil motive or intent, <u>or</u> when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983) (emphasis added). The standard to show "deliberate indifference" is

---

[15] The Medical Defendants argument that the Court should decline supplemental jurisdiction to the extent it dismisses the federal claims is moot because the Court has denied summary judgment on the federal claims.

substantially the same as the standard to show "reckless or callous indifference.  *Thomas v. Luzerne Cnty. Corr. Facility*, 310 F. Supp.2d 718, 722 (M.D. Pa. 2004) (permitting punitive damages claim because the plaintiff alleged defendant's conduct "was intentional, willful and done with deliberate indifference."); *Ravert v. Monroe Cnty.*, No. 4:20-CV-889, 2022 WL 4647431, at *16 (M.D. Pa. Sept. 30, 2022) ("If there are sufficient facts from which a reasonable juror could find deliberate indifference on the part of any defendant, it follows that the plaintiff's claims for punitive damages against that defendant likewise survives summary judgment.").  As explained above, the deliberate indifference claims survive as to Kalinisan and Sofrado; therefore, the punitive damages claims likewise survive summary judgment.

### d.  The Hospital Defendants' Remaining Arguments for Summary Judgment

The Court next considers the Hospital Defendants' statutory argument that Dr. Anderson is not qualified to provide expert testimony against Dr. Santos under N.J.S.A. 2A:53A-41.  There is no dispute that Dr. Santos specialized in psychiatry, which is a specialty recognized by the American Board of Medical Specialties, and was engaged in the practice of psychiatry at the time of the alleged malpractice.  Moreover, there is no evidence before the Court that Dr. Santos is board certified, as he testified that he is only board eligible.  Therefore, the following section of N.J.S.A. 2A:53A-41 applies:

> a. If the party against whom or on whose behalf the testimony is offered is a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association and the care or treatment at issue involves that specialty or subspecialty recognized by the American Board of Medical Specialties or the American Osteopathic Association, the person providing the testimony shall have specialized at the time of the occurrence that is the basis for the action in the same specialty or subspecialty, recognized by the American Board of Medical Specialties or the American Osteopathic Association, as the party against whom or on whose behalf the testimony is offered . . . .

As argued by Plaintiffs, the remaining subsections of N.J.S.A. 2A:53A-41 apply when the party against whom the testimony is offered is board certified or a general practitioner and are irrelevant here.

As explained by the Appellate Division in *Nicholas v. Hackensack University Medical Center*, 456 N.J. Super. 110 (2018), "N.J.S.A. 2A:53A-41(a) does not require that a proposed expert devote a majority of his or her professional time to the practice of the pertinent specialty. It requires only a showing that a proposed expert 'practice in the same specialty' as a defendant physician." *Id.* at 120. The Appellate Division noted in *Nicholas* that the proffered expert practiced in the specialized field of pediatrics and pediatric critical care at the time in issue in that case. And although the expert testified that he devoted most of his professional time to administrative duties and teaching, the Court held that the significant inquiry was not how much time was spent in clinical practice, but in what specialty area did he devote his clinical practice, when he practiced. Because his clinical practice was devoted to the matching specialty, the proffered expert was statutorily qualified pursuant to N.J.S.A. 2A:53A-41(a). *Id.* at 121. Dr. Anderson is a board-certified psychiatrist, and Plaintiffs have provided some evidence that he specialized in the field of psychiatry at the time of the alleged malpractice. As such, the Hospital Defendants are not entitled to summary judgment on the basis that Dr. Anderson is not qualified under N.J.S.A. 2A:53A-41. The motion for summary judgment on this basis is therefore denied.

Dr. Santos also argues that he is entitled to immunity pursuant to N.J.S.A. 2A:62A-16. In *McIntosh v. Milano*, 168 N.J. Super. 466, 489 (Law Div.1979), the New Jersey courts first imposed a duty on psychiatrists to warn potential victims of a dangerous patient. The court required that "[a psychiatrist must] take whatever steps are reasonably necessary to protect an intended or potential victim of his patient when he determines, or should determine, in the

appropriate factual setting and in accordance with the standards of his profession established at

trial, that the patient is or may present a probability of danger to that person." *Id.*

> In 1991, the Legislature enacted N.J.S.A. 2A:62A-16 "to codify *McIntosh* and to clarify the ways in which a mental health practitioner can discharge the duty to warn and protect potential victims of violence without incurring liability for disclosure of confidential information," *Marshall v. Klebanov*, 188 N.J. 23, 35-36, 38, 902 A.2d 873 (2006); *see also* S. Judiciary Comm. Statement to S. Comm. Substitute for S. 3063 (Mar. 11, 1991) (explaining that, in the wake of decisions such as *McIntosh*, the bill would provide licensed practitioners with immunities from civil liability for patients' violent acts absent a duty to warn, and for disclosure of privileged information where there is a duty to warn).

*Coleman v. Martinez*, 247 N.J. 319, 344–45 (2021).  The statute provides in relevant part:

> a. Any person who is licensed in the State of New Jersey to practice psychology, psychiatry, medicine, nursing, clinical social work or marriage counseling ... is immune from any civil liability for a patient's violent act against another person or against himself unless the practitioner has incurred a duty to warn and protect the potential victim as set forth in subsection b. of this section and fails to discharge that duty as set forth in subsection c. of this section.

> b. A duty to warn and protect is incurred when the following conditions exist:

> (1) The patient has communicated to that practitioner a threat of imminent, serious physical violence against a readily identifiable individual or against himself and the circumstances are such that a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out the threat; or

> (2) The circumstances are such that a reasonable professional in the practitioner's area of expertise would believe the patient intended to carry out an act of imminent, serious physical violence against a readily identifiable individual or against himself.

In sum, N.J.S.A. 2A:62A-16(a) immunizes licensed medical professionals in the fields of

"psychology, psychiatry, medicine, nursing, clinical social work, or marriage and family therapy"

from civil liability for patients' violent acts against themselves or third parties "unless the

practitioner has incurred a duty to warn and protect the potential victim."  *Coleman v. Martinez*,

247 N.J. 319, 345 (2021).  Dr. Santos argues that he did not have a duty to warn because no

reasonable psychiatrist would believe that Mr. Borroto intended to imminently, seriously harm himself under the circumstances of this case.

Plaintiffs argue that Dr. Santos' reliance on the statute is misplaced because the claims against Dr. Santos are for malpractice alleging a deviation from the standard of medical care (Count 9) and not for failure to warn.  In *Marshall v. Klebanov*, 188 N.J. 23, 36 (2006), the New considered "whether the statutory immunity provisions of N.J.S.A. 2A:62A–16 immunize a mental health practitioner from potential liability when it is alleged that the practitioner abandoned a seriously depressed patient and failed to provide the patient with appropriate treatment."  The suit in *Marshall* was brought by the patient's husband, who alleged his wife's suicide was proximately caused by the doctor's negligent treatment.  *Id.* at 27-28.  A majority of the New Jersey Supreme Court "h[e]ld that the statutory immunity provisions of N.J.S.A. 2A:62A–16 do not immunize a mental health practitioner from potential liability if the practitioner abandons a seriously depressed patient and fails to treat the patient in accordance with accepted standards of care in the field."  *Id.* at 38.  As the court explained, "[t]he statute's legislative history makes clear that the act was intended only to codify *McIntosh* and to clarify the ways in which a mental health practitioner can discharge the duty to warn and protect potential victims of violence without incurring liability for disclosure of confidential information."  The court further found that "[a] practitioner's common-law duty to exercise that degree of care, knowledge, and skill for his or her patient that would be followed by any reasonable member of the profession under like circumstances exists separate and apart from any duty to warn and protect pursuant to N.J.S.A. 2A:62A–16."  *Id.*  The court deemed it "axiomatic that practitioners be required to exercise reasonable care in the treatment of all patients, including those with suicidal tendencies."  *Id.* at 39.

Subsequent decisions interpreting *Marshall* have not limited to its facts, i.e., where a mental health practitioner abandons her client, and instead have held that the statute does not immunize mental health practitioners from claims of medical negligence. *See, e.g.*, *McKay v. Parkview Holdings, L.L.C.*, 2016 WL 5417838, at *3 (N.J. Super. A.D., Sept. 29, 2016) ("Plaintiff contends, and we agree, that the statute does not immunize the doctors from a claim of medical negligence."). Because Plaintiffs bring claims for medical negligence and not for failure to warn, Dr. Santos is not entitled to immunity. In addition, the Court rejects as unsupported Dr. Santos' strained argument that he did not owe Mr. Borroto a duty of care because he only examined Mr. Borroto to determine if he was safe for incarceration.

Defendant PMC also moves for summary judgment in event the malpractice claims against Dr. Santos are dismissed. Plaintiffs have stipulated that the claims against Defendant PMC are limited to vicarious liability claims for the negligence of Dr. Santos. (PMC's Ex. C; ECF No. 21.) This request is premature, however, because the Court has not granted summary judgment on the negligence claims against Dr. Santos.

Finally, Defendant PMC also moves to limit damages pursuant to N.J.S.A. 2A:53A-7 & 8 to $250,000.00. Plaintiffs do not contest this portion of the Defendant PMC's motion, as they have stipulated that Defendant PMC qualities as a not-for-profit hospital under the Charitable Immunity Act. *See* ECF No. 77-6, Ex. D. As such, the Court grants PMC's motion to limit damages as unopposed.

## IV.    <u>CONCLUSION</u>

For the reasons explained in this Opinion, the Defendants' challenges to Plaintiff's expert reports and testimony and their other evidentiary challenges are denied without prejudice to the filing of motions pursuant to *Daubert v. Merrill Dow Pharmaceutical, Inc.*, 509 U.S. 579, 589

(1993) or other motions in limine, if appropriate.  PMC's motion to limit damages pursuant to

N.J.S.A. 2A:53A-7 & 8 to $250,000.00 is granted as unopposed.  The motions for summary

judgment are otherwise denied for the reasons stated in this Opinion.  This matter is referred to

the Magistrate Judge to set deadlines for *Daubert* motions and for settlement discussions.  An

appropriate Order follows.


DATED: September 27, 2024.

_____
Hon. Madeline Cox Arleo
United States District Judge