**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---------------------------------------------------------------X

The Estate of Carlos Borroto and Maritza Clark and Eric Frias, as Administrators Ad Prosequendum for the Estate of Carlos Borroto,

**CIVIL ACTION NO.:** 2:19-17148(MCA)(JBC)

Hon. Judge Madeline Cox Arleo

Plaintiffs,

vs.

CFG Health Systems, LLC, Hudson County Correctional Center; Ronald P. Edwards; Dorothea Kalinisan; Samonte Sofrado; County of Hudson, New Jersey; Hackensack Meridian Palisades Medical Center; Dr. Frank Santos; John Doe Jail Personnel and/or Corrections Officers 1-5 (fictitious individuals) in their official and individual capacities, and John Doe Healthcare Providers 1-5, (fictitious individuals) in their official and individual capacities,

Defendants.

---------------------------------------------------------------X

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT HACKENSACK MERIDIAN HEALTH PALISADES MEDICAL CENTER'S MOTION TO BAR TESTIMONY OF KRISTEN KUCSMA**

LAW OFFICES OF LORNE M. REITER, LLC
LORNE M. REITER
Attorneys for Plaintiff
124 First Avenue
Atlantic Highlands, New Jersey 07716
732-747-9555
Lreiter@lreiterlaw.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………………..…iii

PRELIMINARY STATEMENT……………………………………………………………...………1

FACTUAL AND RECORDS BACKGROUND…………………………………………………..2

    A.  Carlos Borroto and His Family……………………………...………………………………2
    B.  The Kucsma Report…………………………………………..…………………………..3
    C.  Clark's Deposition Testimony on Carleyn's Visitation………………………………..4
    D.  Kucsma Deposition Testimony…………………………...…………………………………5
    E.  Clark's Testimony on Drug Use…………………………………………………………..6

LEGAL STANDARD…………………………………………………………………………..…7

ARGUMENT……………………...……………………………………………………………9

    I.      KUCSMA'S METHODOLOGY IS RELIABLE, GROUNDED IN RECORD EVIDENCE, AND SATISFIES RULE 702……………………………………………9

        A.  Kucsma Synthesized Multiple Independent Data Sources - Exactly What the Law Requires……………………………………………………………………………….9
        B.  The Year-by-Year Framework Is the Correct Legal Tool, Not Speculation…………..10
        C.  Kucsma's Methodology Satisfies the Specific Requirements of Rule 702(b) and (d)...11

    II.     THE MOTION'S MISREADING OF THE CLARK RECORD ON CARLEYN'S VISITATION IS FATAL TO ITS CORE ARGUMENT………...…………………….12

        A.  The "Once a Week" Answer Described an Aberrant, Judicially-Unconstrained Restricted Period……………………………………………………………………12
        B.  The Baseline Testimony Establishes Twice-Weekly as the Ordinary Pattern…….12
        C.  Kucsma Expressly Cited Both Pages 64 and 93 - Her Analysis Is Not in Conflict with the Record……………………………………………………………….…13
        D.  Daily Phone Contact Provides Independent Support for the Companionship Assumptions……………………………………………………...………………14

    III.    PLAINTIFFS WILL NOT OFFER KUCSMA'S TESTIMONY AS TO MARITZA CLARK'S LOSSES AT TRIAL - BUT THIS ELECTION CARRIES NO CONCESSION AS TO METHODOLOGY OR THE REALITY OF THOSE LOSSES………………………...……………………………………………14

IV.     DRUG USE EVIDENCE GOES TO WEIGHT, NOT ADMISSIBILITY……………16

V.      THE SON'S LIMITED IN-PERSON CONTACT IS A MATTER FOR CROSSEXAMINATION AND JURY ASSESSMENT, NOT PRECLUSION………18

VI.     THE MOTION'S 'INVASION OF JURY FUNCTION' ARGUMENT CONTRADICTS BINDING PRECEDENT AND WOULD ELIMINATE EVERY GREEN V. BITTNER CASE FROM THE COURTROOM………………………….19


CONCLUSION…………………………………………………………………………..21

## **TABLE OF AUTHORITIES**

### CASES

*Benjamin v. Peter's Farm Condo. Owners Ass'n, 820 F.2d 640, 642-643 (3d Cir. 1987)* ……...1, 8

*Daubert, 509 U.S. at 595*……………………...……………..……………….…..5, 6, 7, 13, 14, 17, 18, 19

*Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000)*……………………….…… 1, 2, 7, 8, 10

*Gangemi v. Nat'l Health Labs., 291 N.J. Super. 569, 575-76 (App. Div. 1996)*……………..……16

*Green v. Bittner*, 85 N.J. 1 (1980) ………………...……………………………10, 11, 16, 19, 20

*Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983) …………………….……….1, 8

*Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 809 (3d Cir. 1997)*………..………………….7

*Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)* ……………….....……………..8, 21

*Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994)*………………………………7

### STATUTES

N.J.S.A. 3B:5-4 …………………………………………………………...…………2, 14, 16, 21

N.J.S.A. 2A:31-4 …………………………………………….…………………………………..16

### RULES

Fed. R. Evid. 702 ……………………………...……………...……………………1, 2, 7, 9, 17, 18, 21, 22

Fed. R. 702(b) …………………………………………………………...……………..…11

Fed. R. 702(d) …………………………………………………………………………....11

Fed. R. Evid. 702(a) ……………………………………………………………...…………….21

**PRELIMINARY STATEMENT**

Defendant Hackensack Meridian Health Palisades Medical Center ("Palisades") asks this Court to preclude plaintiffs' highly credentialed and well-qualified expert economist Kristin K. Kucsma, M.A., of the Sobel Tinari Economics Group, despite the opinions being methodologically impeccable and properly sourced. There is no basis in law for this request and it should be denied.

The motion's central attack is a misreading of a single deposition answer torn from its context. The motion rests on the contention that Kucsma wrongly assumed Borroto visited his daughter Carleyn three times per week, when Clark's own deposition testimony, Palisades says, establishes only once-per-week visitation. That contention is factually wrong. Clark's "once a week" answer was given in response to a question that defense counsel had expressly limited to the period excluding the four months during which the child's mother had blocked all contact between Borroto and Carleyn. It describes a period of disrupted, artificially-constrained access - not Borroto's ordinary parenting. The baseline testimony, appearing twenty-nine pages earlier in the same transcript at page 64, is unambiguous: "He always saw his daughter twice a week until [the child's mother] made a problem." Kucsma cited both pages 64 and 93, combined them with a February 2023 forensic interview, and arrived at three visits per week as a reasonable composite. That is precisely the multi-source methodology that Rule 702 and the Third Circuit require.

The balance of the motion fares no better. Its methodology challenge misapplies *Elcock*, *Benjamin*, and *Gumbs* - cases that excluded economists who constructed earnings projections from nothing - to an expert who synthesized four independent data sources: direct family interviews, sworn deposition testimony from two witnesses, the American Time Use Survey published by the U.S. Bureau of Labor Statistics, and The Dollar Value of a Day, a peer-reviewed actuarial publication from Expectancy Data Corporation. Its drug-use argument founders on Clark's own testimony that her son was sober and "fine" during visits with his daughter. Its "invasion of jury

1

function" argument contradicts the Third Circuit's holding in *Elcock* that economists who translate hours of family services into dollar values do something the jury cannot do for itself.

Plaintiffs acknowledge that, under N.J.S.A. 3B:5-4, where two surviving children exist, Maritza Clark does not take as an intestate beneficiary and the wrongful death recovery flows to the children. In light of that legal limitation on distribution, Plaintiffs will not offer Ms. Kucsma's testimony at trial as to any component of economic loss attributed to Ms. Clark - household services ($633,968), daytime companionship services ($490,236), nighttime companionship services ($1,715,827), and advice and counsel to her ($67,362), totaling $2,907,393. This acknowledgment of the legal limitation on Ms. Clark's recovery carries with it no concession that she has not suffered genuine, real, and deeply felt pecuniary losses - she has - and no concession that Ms. Kucsma's methodology for valuing those losses is deficient in any respect - it is not. Ms. Clark lived with, was cared for by, and meaningfully depended upon her son. The services she lost are real. The fact that those losses cannot be recovered through the estate's wrongful death claim does not render Ms. Kucsma's analysis of them any less rigorous or reliable.

Kucsma's analysis with respect to the children - companionship services and advice and counsel to Carleyn Borroto (residing in Bayonne, New Jersey) and Carlos Jayden Borroto (residing in Orlando, Florida) - are supported by adequate factual foundation, reliably applied methodology, and are precisely the kind of pecuniary valuation the New Jersey Wrongful Death Act and Rule 702 contemplate. The motion to preclude should thus be denied in its entirety.

## FACTUAL AND RECORD BACKGROUND

### A. Carlos Borroto and His Family

Carlos Borroto was born September 28, 1991, and died March 25, 2018, at age twenty-six, while a pretrial detainee at Hudson County Correctional Center. He died by suicide after defendants failed to monitor or treat a vulnerable patient/arrestee with well-documented

suicidality. He resided with his mother, Maritza Clark, for the entirety of his life in West New York, New Jersey.[1]

Borroto had two children: Carlos Jayden Borroto (born November 4, 2011), who moved to Orlando, Florida at age four when his mother received custody, and Carleyn Borroto (born September 17, 2012), who resides in Bayonne, New Jersey. Clark testified at length about the relationships Borroto maintained with both children and the depth and consistency of those relationships before his incarceration.

Clark, who suffered a disabling hand injury in 2015 and has not worked since, depended on Borroto for household tasks and emotional support.[2]

### B.  The Kucsma Report

Sobel Tinari Economics Group was retained to evaluate the economic losses resulting from Borroto's death. Kristin K. Kucsma, M.A., and Kenneth T. Betz, MBA, M.A., prepared a written Appraisal of Economic Loss dated April 5, 2023 (the "Report"). The Report expressly excludes lost income and financial support, and confines itself to the pecuniary value of the services Borroto would have provided to his family.[3]

Kucsma drew on four independent sources in constructing her analysis: (1) a structured fact-finding questionnaire completed during a telephone interview of Clark and Eric Frias on February 13, 2023; (2) the deposition transcripts of Clark (September 29 and 30, 2021) and Frias (December 2, 2021); (3) the American Time Use Survey ("ATUS"), published by the U.S. Department of Labor Bureau of Labor Statistics; and (4) The Dollar Value of a Day, a peer-reviewed actuarial publication from Expectancy Data Corporation providing government time-diary data on

---

[1] Deposition of Maritza Clark, September 29, 2021 ["Clark Day 1"], at 14:9-14 (Carlos resided with his mother his entire life).
[2] Clark Day 2, at 70:16-25; Sobel Tinari Economics Group Fact-Finding Questionnaire ("FFQ"), p. 3.
[3] Kucsma Report, at 2 ("we do not include a loss of income or financial support at this time").

household and companionship service hours. The Report applied BLS Occupational Employment Statistics and Genworth Cost of Care Survey data to establish market wage rates for each category of service. Kucsma applied standard present-value discount methodology using U.S. Treasury yields.[4]

The Report calculates losses across five categories: (1) household services to mother ($633,968); (2) daytime companionship services to mother ($490,236); (3) nighttime companionship services to mother ($1,715,827); (4) companionship services to children - $367,428 to Carleyn and $74,179 to Carlos Jayden (combined: $441,607); and (5) advice and counsel services to children ($179,879). Total: $3,528,879, subject to updating through trial.[5] As stated in the Preliminary Statement, Plaintiffs will not present the mother-attributed categories (1)– (3) and the advice-and-counsel-to-mother category (subtotal: $2,907,393) to the jury.

### C.  Clark's Deposition Testimony on Carleyn's Visitation

The defense motion hinges on a purported conflict between Kucsma's assumed visitation frequency (three times per week) and Clark's deposition testimony. The full record, however, refutes that characterization at every turn.

**Baseline testimony** (Clark Day 2, p. 64).  Answering the open-ended question - "prior to him not seeing her for four months, how often would he see her?" - Clark answered without restriction or qualification: "He always saw his daughter twice a week until [Borroto's girlfriend] made a problem, had an issue and stopped - and that stopped. She prevented him from seeing her." Clark Day 2, at 64:15–19.[6] This is the ordinary, habitual, undisturbed frequency of Borroto's visits with his daughter. It is the answer that describes his parenting before external interference.

---

[4]Kucsma Report, at 6 (citing U.S. Dept. of Labor, BLS, American Time Use Survey; Dollar Value of a Day; and Genworth Cost of Care Surveys).

[5]Kucsma Report, at 39 (Summary table).

[6]Deposition of Maritza Clark, September 30, 2021 ["Clark Day 2"], at 64:17-19; *see also* 64:3-14 (noting that Carlos Borroto had "the most beautiful relationship with Carly, his daughter")

4

**Restricted-period testimony** (Clark Day 2, p. 93).  Defense counsel then asked Clark about Carleyn's visitation "excluding that four month period where he did not see her at all." (Clark Day 2, at 93:4–6). Clark responded: "he visited her once a week."[7] This answer describes frequency during a period of maximum disruption - after the child's mother had unilaterally curtailed contact, at a time when Clark herself confirms Borroto was nevertheless in daily phone contact with Carleyn.[8]

The motion quotes page 93 alone, without disclosing the limiting prefatory question that defined the time period in issue or the baseline answer at page 64.[9] Kucsma's Report, by contrast, expressly cites both pages 64 and 93 of the Clark Day 2 transcript, as well as the February 2023 family interview.[10] Kucsma thus reviewed the complete evidentiary picture and arrived at three visits per week as a reasonable composite figure grounded in multiple sources. The motion's attack on that figure is not a *Daubert* argument; it is a selective citation of the record designed to conceal evidence favorable to plaintiffs.

**D.  Kucsma Deposition Testimony:** The deposition of Kucsma was conducted on July 24, 2023. (See copy of Kucsma Deposition and interview notes attached hereto as Ex. A).  Prior to Kucsma's deposition, handwritten notes from the phone interview between Kucsma and Clark and Frias were produced and referenced during her deposition.  Those notes make it plain that Kucsma was advised during her interview with Mr. Borroto's mother and brother that he took the train 3 times per week to see his daughter Carley, spending 2-3 hours with her per visit.  Kucsma was asked in general terms how she would square any discrepancies between deposition testimony reviewed and responses provided during the phone interview.  She testified that she would need to

---

[7]Clark Day 2, at 93:4-9.
[8]Clark Day 2, at 93:7-8 ("During the four months he didn't see her, he talked to her over the phone every day.").
[9]Motion (Doc. 146-1), at 17, citing Clark Day 2, p. 93 only.
[10]Kucsma Report, at 7 ("SOURCES: telephone interview of Eric Frias and Maritza Clark, taken on February 13, 2023; transcript of the Deposition of Maritza Clark, taken on September 30, 2021, pp. 64 and 93") (emphasis added).

5

look at the full context of the questions by counsel and the answers to answer this question. (Kucsma, p.111-112). Kucsma repeatedly testified that, for each category, she, "considered information obtained during the telephone interview, information obtained by review of the deposition testimony and data published through the American Time Use Survey." (Kucsma, p.87:1-5).

### E. Clark's Testimony on Drug Use

The motion argues that Borroto's substance abuse history undermines Kucsma's assumptions. The record cuts the other way. When asked specifically whether Borroto was under the influence during visits with his daughter, Clark testified: "With me being present, no. When I took him to see the girl, he was fine..."[11] Indeed, given the undisputed fact that Borroto struggled with drug addiction, evidence that he remained sober during visits with his young children is highly probative of the quality of those encounters and the foundational importance of those relationships to the deceased. Again, Kucsma testified at the time of her deposition with regard to Mr. Borroto's drug use as a factor, that she "used an average number of hours, again, based upon information that had been provided to [her] about the relationship that Mr. Borroto had had with his children. [Her] understanding is that he had…psychiatric issues…and a history of addiction and substance abuse. The information provided to [her] about the relationship that he had with his children would have reflected at least some of those conditions or issues already." (Kucsma, p.126:24-127:17). In any event, disputes of fact about Borroto's drug use or the impact his addiction might have had on his relationship with his children had he lived are not relevant to the *Daubert* analysis.

---

[11]Clark Day 2, at 94:4-8 ("With me being present, no [he was not under the influence with the children]. When I took him to see the girl, he was fine…").

6

**LEGAL STANDARD**

Federal Rule of Evidence 702 provides that a qualified expert may testify in the form of an opinion if the proponent demonstrates it is more likely than not that: (a) the expert's specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702.

The district court performs a "rigorous gatekeeping" function. *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). But gatekeeping does not mean resolving factual disputes or assessing the credibility of competing testimony. *Daubert*, 509 U.S. at 595: "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." The inquiry is "a flexible one" and the touchstone is reliability, not certainty. *Id*. at 594.

In the Third Circuit, exclusion is reserved for opinions that are wholly without record foundation. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). A court evaluates whether the expert "applied a reliable methodology," not whether that methodology was applied with perfect precision. *In re Paoli*, 35 F.3d at 744 (the gatekeeping inquiry focuses on "whether [the expert] applied a reliable methodology," not on whether she applied the methodology correctly); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997) (same). A qualified expert who synthesizes family testimony, deposition records, and government statistical benchmarks using standard economic modeling has applied a reliable methodology even if reasonable people might weight the sources differently. Disputes about that weighing are for the jury and for cross-examination - not bases for preclusion under *Daubert*.

7

The Supreme Court has further instructed that "the *Daubert* factors (peer review, publication, potential error rate, and general acceptance) are not mandatory or exclusive" and may or may not be pertinent depending on the nature of the expertise. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Forensic economic valuation of lost family services is a well-established methodology practiced by experts across the country. It does not depend on laboratory testing or peer-reviewed experiments; it depends on sound data sources, transparent assumptions, and reliable market-rate benchmarks - all of which Kucsma supplied.

The cases on which Palisades primarily relies - *Elcock*, *Benjamin*, and *Gumbs* - all involved earnings projections based on no record evidence whatsoever. In *Benjamin*, the expert relied "solely" on the plaintiff's unsubstantiated personal assessment with "no additional corroborating evidence." *Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640, 642-643 (3d Cir. 1987). In *Gumbs*, the expert assumed the plaintiff's future income would be more than twice her historical average with no supporting vocational evidence. *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983). In *Elcock*, the expert assumed a plaintiff who had earned only $5,774 in her last year of employment would have earned $12,480 - again, with no corroboration. 233 F.3d at 756. None of those experts had what Kucsma has: sworn deposition testimony, a structured family interview, government time-use data, and published actuarial benchmarks, all of which converge on a consistent picture of Borroto's contributions to his family as calculated to a reasonable degree of professional certainty by an eminently qualified economist.

## ARGUMENT

### I.    KUCSMA'S METHODOLOGY IS RELIABLE, GROUNDED IN RECORD EVIDENCE, AND SATISFIES RULE 702.

**A. Kucsma Synthesized Multiple Independent Data Sources - Exactly What the Law Requires**

The motion caricatures Kucsma's analysis as a chain of unsubstantiated "assumptions." The record refutes this characterization decisively. For each and every component of the Report, Kucsma identified the specific evidence she relied upon and documented it in her footnotes. That is standard forensic economic practice and provides no basis for preclusion or limitation.

For household services, Kucsma relied on: (a) Clark's statements during her interview with Kucsma regarding chores Borroto performed - grocery shopping, cutting the grass, taking out the garbage, patching holes, shoveling snow, sweeping, mopping, vacuuming, laundry, appliance repair, car washing, errand-running, and dishwashing; (b) the Sobel Tinari Fact-Finding Questionnaire completed during the February 2023 interview; and (c) The Dollar Value of a Day, Table 44, which provides government-sourced time-diary benchmarks for part-time employed males co-residing with another household member - the closest available statistical cohort to Borroto's situation.[12] That benchmark yields 17.57 hours per week (914 hours annually), which Kucsma then verified against the family-specific information.[13] Triangulating actuarial benchmarks against sworn testimony is not speculation; it is exactly the kind of dual-source analysis that gives the jury meaningful guidance.

For companionship services to his mother, Kucsma relied on: (a) Clark's extensive deposition testimony describing daily emotional and household support; (b) the family interview; and (c) the

---

[12]Kucsma Report at 5, 10 (citing The Dollar Value of a Day, Time Diary Analysis, 2020 Dollar Valuation, Expectancy Data Corp., Shawnee Mission, KS, 2021, Table 44).
[13]Dollar Value of a Day, Table 44 (17.57 hrs/wk = 914 hrs/yr for part-time employed males living with another household member); Kucsma Report at 10.

ATUS, which provides average national hourly data for companionship-related activities including leisure, dining, and social interaction. The resulting picture - a twenty-six-year-old man who lived with his disabled mother, assisted with a variety of household affairs - supports both the twelve-hour-per-week daytime companionship figure and the nighttime availability figure with ample record justification.

For children's companionship and advice and counsel, Kucsma relied on, *inter alia*, the February 2023 family interview (attended by both Clark and Frias), the Clark and Frias deposition transcripts, and ATUS benchmarks. At her deposition, Kucsma explained her integrated methodology with precision and consistency each time she was asked:

> "I relied upon information provided to me by the family about on average how often Mr. Borroto spends time with his mother, the types of activities that they enjoyed undertaking with one another, and then I also reviewed the benchmark statistical data and then collectively... I did determine that a reasonably reliable estimate of the number of hours... was, on average, 12 hours per week."

Deposition of Kristin Kucsma, July 24, 2023 ["Kucsma Dep."], at 27:19-28:4.

The foregoing is the antithesis of what the Third Circuit condemned in *Elcock* and its predecessors. In each of those cases, the challenged expert relied on a single, self-serving, unverifiable source with no corroboration. Kucsma relied on four converging, credible sources in a transparent process that is scientifically rigorous and will be subjected to cross-examination.

**B.  The Year-by-Year Framework Is the Correct Legal Tool, Not Speculation**

The motion complains that Kucsma merely provided year-by-year tables and then assumed services would continue. But that format is precisely what the law demands. Chief Justice Wilentz's opinion in *Green v. Bittner* contemplated a jury-adjustable economic framework that translates expert hourly valuations into dollar figures the jury can accept, reduce, or recalculate based on its own assessment of the facts. 85 N.J. 1, 11-12 (1980). As Kucsma explained at deposition, if the jury concludes that Borroto would have provided fewer hours than she assumed,

10

"they could take that figure and cut it in half." Kucsma Dep. at 19:21-20:9. If the jury believes he would have provided more, they could multiply accordingly. The year-by-year table is not a speculative leap; it is the vehicle through which the jury exercises its function.

Without an economist to translate hours of companionship services into a marketplace dollar equivalent, the jury would have no principled basis for any award at all. The very purpose of a *Green v. Bittner* economist is to supply the market-rate anchor - not to tell the jury how many hours Borroto spent with his family, but to tell the jury what those hours would cost if purchased in the open marketplace. The former is for fact witnesses and the jury; the latter is the specialized knowledge Kucsma supplies.

### C. Kucsma's Methodology Satisfies the Specific Requirements of Rule 702(b) and (d)

Rule 702(b) requires that the testimony be "based on sufficient facts or data." The motion identifies no gap in Kucsma's factual foundation - it challenges her interpretation of specific data points, not an absence of data. There is credible information in the record about household chores performed, recreational activities shared, weekly visitation frequency, and daily phone calls. There is government actuarial data on how much time individuals spend in those activities. There are market surveys of what professional companions charge. All of that, taken together, is sufficient "facts or data" under Rule 702(b).

Rule 702(d) requires that the opinion reflect "a reliable application" of the principles and methods to the facts. Kucsma applied her principles - multiply verified hours by market-tested hourly rates; discount to present value at a rate derived from Treasury yield data - consistently across every component of the Report. The application is not only reliable; it is transparent, replicable, and subject to adversarial testing by the defense's own expert and cross-examination.

11

## II.    THE MOTION'S MISREADING OF THE CLARK RECORD ON CARLEYN'S VISITATION IS FATAL TO ITS CORE ARGUMENT.

The motion's central argument is that Kucsma assumed Borroto visited Carleyn "three times per week" while Clark testified to "once a week." That argument rests on a selective and misleading quotation that omits the limiting question that produced the cited answer and ignores the clear and unqualified baseline testimony in the same transcript.

### A. The "Once a Week" Answer Described an Aberrant, Judicially-Unconstrained Restricted Period

At page 93 of her September 30, 2021 deposition, Clark answered that Borroto "visited [Carleyn] once a week." But the question that preceded that answer was:

> "How about Carlos's daughter; how often did he see her, excluding that four month period where he did not see her at all?"

Clark Day 2, at 93:4-6.

Defense counsel instructed Clark to answer about a period already defined by dramatically reduced contact - the months following Borroto's girlfriend's interference with visitation. The "once a week" answer describes Borroto's access after his girlfriend (not the child's mother) "prevented him from seeing her." Clark Day 2, at 64:18-19. It is thus not a description of his ordinary, habitual practice as a father; it is the floor that survived after deliberate third-party interference. Defense counsel knew the four-month period was anomalous and crafted a question that would elicit an answer confined to that aberrant period and now presents that limited testimony as comprehensive while concealing the baseline testimony that preceded it.

### B. The Baseline Testimony Establishes Twice-Weekly as the Ordinary Pattern

Twenty-nine pages before the "once a week" answer, at page 64 of the same transcript, Clark testified without any restriction to the normal pattern:

> "He always saw his daughter twice a week until [his girlfriend] made a problem, had an issue and stopped - and that stopped. She prevented him from seeing her."

12

Clark Day 2, at 64:17–19.[14]

This is unambiguous testimony. "Always" is not an estimate or an approximation. It describes the consistent, habitual frequency that Borroto maintained before external interference disrupted it. The word "until" locates the disruption in time. The remainder of Clark's answer confirms that the once-per-week restricted frequency was the consequence of the girlfriend's interference, not reflecting Borroto's typical parenting pattern or priorities.

The motion makes no reference to page 64. It does not mention the word "always," the phrase "twice a week," or the girlfriend's role in temporarily disrupting visitation. The Court should take careful note of this omission. The defense is not making a *Daubert* argument based on the full record; it is making a selective citation argument based on the portion of the record most favorable to its position.

### C. Kucsma Expressly Cited Both Pages 64 and 93 - Her Analysis Is Not in Conflict with the Record

Kucsma's Report states with precision: "Mr. Borroto reportedly saw his daughter three (3) times per week, when he took the train to Bayonne. He saw his daughter each visit for approximately two (2) to three (3) hours. He also spoke to her on the phone five (5) to seven (7) days a week for 30 minutes. [SOURCES: telephone interview of Eric Frias and Maritza Clark, taken on February 13, 2023; transcript of the Deposition of Maritza Clark, taken on September 30, 2021, pp. 64 and 93.]" Kucsma Report, at 7 (emphasis added).

Kucsma reviewed both the baseline testimony (twice per week, undisturbed) and the restricted-period testimony (once per week, following interference), synthesized them with what Clark and Frias provided in the February 2023 family interview, and arrived at three times per week as a

---

[14]Clark Day 2, at 64:17-19.

composite figure. That figure sits between the undisturbed pattern (as high as twice per week from Clark's page-64 testimony and additional visits disclosed in the family interview) and the floor of the brief, disrupted period surrounding the girlfriend's interference.

Even accepting the motion's preferred figure - once per week - as the correct input, that would reduce Kucsma's companionship damages for Carleyn, not eliminate them. The motion does not ask for a reduction consistent with one-per-week visitation; it asks for total preclusion. That is not a logical consequence of the evidentiary dispute it raises, and it is not what *Daubert* authorizes.

### D. Daily Phone Contact Provides Independent Support for the Companionship Assumptions

Kucsma also assumed that Borroto spoke with Carleyn by phone five to seven days per week for thirty minutes. Clark provided the evidentiary anchor for this assumption when she testified that, even during the four months the girlfriend restricted in-person contact, Borroto "talked to [Carleyn] over the phone every day." Clark Day 2, at 93:7-9. If Borroto maintained daily telephonic contact even during the brief period of maximum estrangement, the five-to-seven-day phone assumption is, if anything, conservative for the ordinary period of unrestricted contact. The motion ignores this testimony entirely.

### III. PLAINTIFFS WILL NOT OFFER KUCSMA'S TESTIMONY AS TO MARITZA CLARK'S LOSSES AT TRIAL - BUT THIS ELECTION CARRIES NO CONCESSION AS TO METHODOLOGY OR THE REALITY OF THOSE LOSSES.

The motion argues that the damages components attributed to Maritza Clark - household services ($633,968), daytime companionship ($490,236), nighttime companionship ($1,715,827), and advice and counsel to her ($67,362), totaling $2,907,393 - must be excluded because Clark does not take as an intestate beneficiary under N.J.S.A. 3B:5-4. Plaintiffs acknowledge this legal limitation. Because Ms. Clark does not take as a beneficiary of the wrongful death recovery where

surviving children exist, Plaintiffs will not offer this testimony at trial. The Court need not resolve the motion as to these components.

But this election carries with it several critical reservations that the Court and the parties must understand.

First, the acknowledgment of the legal limitation on distribution does not constitute a concession of methodological deficiency or any doubt about the reality of Ms. Clark's losses. Maritza Clark suffered real, genuine, and substantial pecuniary losses. The woman who raised her son alone, worked more than fifty hours a week to support her family, suffered a disabling hand injury in 2015, and from that point depended on her son to manage the household he had lived in every day of his life - she lost services and companionship that Ms. Kucsma has valued with methodological rigor and record support. The household services calculation rested on a detailed enumeration of chores Borroto actually performed, verified against government time-diary benchmarks for cohabiting males. The daytime companionship calculation rested on deposition testimony describing years of shared activities. The nighttime companionship calculation rested on the well-recognized principle, endorsed in The Dollar Value of a Day and the U.S. Department of Labor's own Fact Sheet 79A, that a person's overnight availability in a household has measurable market value as protection and emergency readiness. None of these figures are fabricated, inflated, or methodologically deficient.

Second, Plaintiffs' acknowledgment of the legal limitation moots the motion as to the Clark-attributed figures. There is nothing left for the Court to preclude on those components. Plaintiffs will not offer that testimony. The Court should deny the motion as moot with respect to those components, and that denial should not be accompanied by any finding that endorses the defense's methodological attacks on Ms. Kucsma's analysis of Ms. Clark's losses.

15

Third, it bears noting that the motion's legal argument is in any event not as straightforward as it suggests. The motion conflates two distinct statutory frameworks. The New Jersey Wrongful Death Act, N.J.S.A. 2A:31-4, identifies who may receive wrongful death damages; the intestate succession statute, N.J.S.A. 3B:5-4, governs who takes from a decedent's estate in intestacy. Chief Justice Wilentz's opinion in *Green v. Bittner*, which forms the legal and methodological foundation for Ms. Kucsma's entire analysis, arose specifically in the context of a parent's claim for loss of a child's companionship services, and endorsed such recovery.[15] The *Gangemi* court applied Green to permit precisely this category of loss. 291 N.J. Super. at 575-76.[16] Plaintiffs do not press the legal merits here because their acknowledgment of the N.J.S.A. 3B:5-4 framework renders it unnecessary. But the Court should not read Plaintiffs' practical acknowledgment of the distribution question as an adoption of the defense's position that a parent's losses categorically cannot be recovered in wrongful death. That question remains open and is not decided by this motion.

The proper order is therefore: (1) deny the motion as moot with respect to Clark's components because, in light of the N.J.S.A. 3B:5-4 distribution framework, Plaintiffs will not offer that testimony at trial; and (2) deny the motion on the merits with respect to the children's components. No other disposition is warranted.

## IV.    DRUG USE EVIDENCE GOES TO WEIGHT, NOT ADMISSIBILITY.

The motion argues that Borroto's substance abuse history so fundamentally undermines Kucsma's service assumptions that her opinion should be precluded. This argument fails for three independent reasons, each of which is fatal to the motion's position.

---

[15]Green v. Bittner, 85 N.J. 1, 424 A.2d 210 (1980).
[16]Gangemi v. Nat'l Health Labs., 291 N.J. Super. 569, 575-76 (App. Div. 1996).

First, the evidentiary foundation the motion identifies does not establish what the motion claims.  Clark's testimony that Borroto was under the influence "every day" was given in response to a question framed around "since the first time that you noticed your son to be under the influence of drugs." Clark Day 2, at 21:12–14. It describes a troubled period in a young man's life that included multiple rehabilitation efforts, clean test results over extended periods, and sustained boxing training that required physical condition and mental discipline. More critically, Clark testified specifically about drug use during visits with his daughter: "With me being present, no. When I took him to see the girl, he was fine." Clark Day 2, at 94:7–9. The motion asks the Court to assume that because Borroto used drugs at some times, he was necessarily impaired at all times - including during every observed visit with his daughter. The record does not support that inference.

Second, Kucsma was fully aware of Borroto's substance abuse history.  The Report discloses it in the Background Facts section, noting his history of "addiction and substance abuse." Kucsma Dep. at 8:2–4 (Kucsma reviewed the CFES defense report). Having been made aware of the substance abuse history and having reviewed a competing expert report that presumably addressed it, Kucsma made a professional judgment about how to weigh that information in the context of the family testimony and statistical benchmarks she relied upon. A methodological choice that Kucsma made consciously and transparently, with knowledge of countervailing evidence, is not a foundational deficiency under Rule 702; it is, if anything, grist for cross-examination.

Third, and most fundamentally, this is a weight argument dressed in *Daubert* clothing. The motion does not identify any data Kucsma failed to consider or any source she misread. It argues that she should have weighed the drug use information differently - that the hour estimates should have been reduced to account for impairment. That is an opinion about how the analysis should have been done, not a demonstration that it rests on no foundation at all. The Center for Forensic

17

Economic Studies prepared a competing report; defendants can present that report and cross-examine Kucsma about her methodology choices. What they cannot do under *Daubert* and Rule 702 is use a methodological disagreement as a basis to eliminate Kucsma's testimony from the trial. *See Daubert*, 509 U.S. at 595.

### V.    THE SON'S LIMITED IN-PERSON CONTACT IS A MATTER FOR CROSS-EXAMINATION AND JURY ASSESSMENT, NOT PRECLUSION.

The motion argues that Kucsma's assumption of fifty-six hours per year of companionship services for Carlos Jayden lacks foundation because Clark testified that "nobody in the family saw the child again" after he moved to Florida at age four. Clark Day 2, at 92:25-93:3. This argument fails for several reasons.

First, the fifty-six-hour annual figure is exceptionally modest. Fifty-six hours per year amounts to approximately one hour per week. This is not a projection of frequent in-person contact; it is consistent with annual visits, telephonic contact, video calls, or a combination thereof, and if anything almost certainly underestimates the potential future contact between Borroto and his son. The Report discloses that Kucsma received information about this relationship from the February 2023 family interview with Clark and Frias.

Second, the testimony the motion relies upon is not as definitive as the motion suggests. Frias testified: "I don't think he saw him. Once he moved, I think he went years without seeing him." Frias Dep. at 1421:1–3.[17] "I don't think" and "I think" are hedged estimates, not first-hand observations. Frias lived in Detroit at various points during the relevant period and did not have complete knowledge of his brother's contacts. Clark's testimony that "nobody in the family saw the child again" refers to the family unit's collective contact - it does not purport to establish what Borroto himself maintained by way of telephone or digital contact with his own son, contact that

---

[17]Deposition of Eric Frias, December 2, 2021 ["Frias Dep."], at 1421:1-3.

Frias specifically acknowledged he could not speak to. At trial, the Frias and Clark testimony will be amplified and supplemented with the testimony of the children's guardians, likely strongly substantiating and bolstering Kucsma's estimates.

Third, even if the foundation for Carlos Jayden's figures is thinner than for Carleyn's, the appropriate disposition is cross-examination and jury assessment, not preclusion. Courts do not bar expert testimony because a factual input is disputed; they permit the adversaries to present competing evidence and allow the jury to determine which account is more reliable. If the jury concludes that Borroto maintained no contact with his son after the move to Florida, it can award zero for that component. Kucsma's year-by-year tables make that adjustment arithmetically simple. That is the jury system working as designed.

Finally, Plaintiffs respectfully note that the motion itself concedes the permissibility of Kucsma's general methodology by asking the Court to limit her to "the only element of her 'Economic Appraisal' that has some basis in the factual record" - the advice and counsel to Carleyn. Motion, at 18.[18] That concession is instructive. The defense acknowledges that some portion of Kucsma's opinion rests on an adequate factual foundation. The motion is therefore not a challenge to Kucsma's qualification or her overall methodology; it is a targeted challenge to specific inputs. That is a weight argument presented in *Daubert* packaging.

**VI.    THE MOTION'S 'INVASION OF JURY FUNCTION' ARGUMENT CONTRADICTS BINDING PRECEDENT AND WOULD ELIMINATE EVERY *GREEN V. BITTNER* CASE FROM THE COURTROOM.**

The motion argues that Kucsma should not be permitted to opine on "the number of hours" Borroto would have spent with his family members because a juror can determine that question without expert assistance. Motion, at 13. This is incorrect as a matter of law, internally inconsistent,

---

[18]Motion, at 18.

and would - if accepted - effectively abolish the forensic economics profession in New Jersey wrongful death litigation.

Kucsma does not testify about family time as a lay observer. She testifies about (a) what the evidentiary record and government statistical benchmarks support as a reasonable average-hours estimate, and (b) what those hours are worth in the marketplace. The second function - translating hours of companionship services into a dollar equivalent using Genworth Cost of Care Survey data, BLS Occupational Employment Statistics, and U.S. Treasury yield benchmarks - is specialized knowledge that is not within the ordinary ken of a juror. Without an economist performing that translation, a jury has no principled way to assign any dollar figure to the loss of companionship services. It would be guessing.

This is precisely what Chief Justice Wilentz recognized in *Green v. Bittner*: that lost companionship services have "pecuniary value" that can be measured by what it costs to hire a companion in the marketplace, and that this market-rate assessment requires expert input because it rests on specialized knowledge of industry wage data that the average juror does not possess. Kucsma's report does exactly what Chief Justice Wilentz described. Eliminating the testimony on the ground that juries can somehow assess the dollar value of companionship services without an economics expert would require overruling the methodology that *Green v. Bittner* established and that New Jersey courts have applied for nearly half a century.

The motion's position is also internally contradictory. Having argued that juries do not need expert help to count hours, the motion then proposes to allow Kucsma to testify about the market rate for those hours. Motion, at 18. But the market rate is meaningful only when multiplied by hours. If Kucsma can say "the market rate for companionship services in New Jersey is $33 per hour," but cannot say how many hours should be multiplied against that rate, she gives the jury a number with nothing to multiply. The motion's proposed limitation would render Kucsma's

20

testimony simultaneously admissible and useless - a self-defeating disposition that makes no sense under Rule 702.

The fact that a juror could guess at the number of hours a father might spend with his daughter does not mean expert testimony on that subject "will not help the trier of fact." Fed. R. Evid. 702(a). The standard is whether the testimony helps the jury - and structured analysis of how government time-use data triangulates against sworn family testimony to yield a reliable hour estimate unquestionably helps. *See Kumho Tire*, 526 U.S. at 152.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order:

(1)  Denying as moot the motion with respect to the components of economic loss attributed to Maritza Clark - household services ($633,968), daytime companionship ($490,236), nighttime companionship ($1,715,827), and advice and counsel to her ($67,362) - because, in light of the legal limitation imposed by N.J.S.A. 3B:5-4, Plaintiffs will not offer Ms. Kucsma's testimony on those components at trial. This denial as moot should not be construed to endorse, adopt, or accept any of the defense's methodological attacks on those components. The losses Ms. Clark suffered are real. Ms. Kucsma's methodology for valuing them is sound. The decision not to present those figures to this jury reflects Plaintiffs' acknowledgment of the governing distribution statute, and nothing more; and

(2)  Denying on the merits the motion with respect to all components attributed to the children - companionship services to the children ($441,607, comprising $367,428 to Carleyn and $74,179 to Carlos Jayden), advice and counsel to the children ($179,879), and all other components of the children's economic losses as calculated in the Report and updated through trial. As to those claims, Ms. Kucsma's methodology is reliable, her factual foundation is adequate, and her opinions are grounded in the sworn testimony of percipient witnesses and government-published statistical

21

benchmarks. Nothing in the defense's submission identifies a foundational vacancy that would support preclusion under Rule 702 and controlling Third Circuit precedent.

Defendants retain every tool the adversarial system provides to contest Ms. Kucsma's hour estimates at trial: cross-examination on the specific data inputs, presentation of the competing CFES analysis, and argument to the jury that the hour figures are overstated. What Rule 702 does not authorize is converting a methodological disagreement - one that, at its core, turns on which portion of Clark's deposition testimony to credit for Carleyn's visitation frequency - into a basis for wholesale preclusion of a qualified expert whose opinions rest on a multi-source evidentiary foundation that the Third Circuit has consistently upheld.

Kristin Kucsma should be permitted to testify.

Respectfully submitted,

ELEFTERAKIS, ELEFTERAKIS & PANEK
John Elefterakis, Esq.
Wayne Wattley, Esq.
80 Pine Street, 38th Floor
New York, New York 10005

LAW OFFICES OF LORNE M. REITER, LLC
Laura C. Johnson, Esq.
124 First Avenue
Atlantic Highlands, New Jersey 07716

Attorneys for Plaintiffs
Dated: April 6, 2026